1                    IN THE UNITED STATES DISTRICT COURT
                          EASTERN DISTRICT OF CALIFORNIA
2

3     MARTIN J. WALSH,
              Plaintiff,
4                                           Sacramento, California
      vs.                                   No. 2:22-cv-00756-WBS-KJN
5                                           Thursday, July 7, 2022
      CHE GARIBALDI, et al.,                10:01 a.m.
6             Defendants.
      _____/
7
                          TRANSCRIPT OF PROCEEDINGS
8                    PLAINTIFF'S MOTION FOR TRO
          BEFORE THE HONORABLE WILLIAM B. SHUBB, DISTRICT JUDGE
9                            ---oOo---

10
      APPEARANCES:
11
        For the Plaintiff:            UNITED STATES DEPARTMENT OF
12                                    LABOR
                                      90 Seventh Street,
13                                    Suite 3-700
                                      San Francisco, CA  94103
14                                    By:  JENNIFER L. STA.ANA
                                      Attorney at Law
15

16      For the Defendants:          FISHER & PHILLIPS, LLP
                                      621 Capitol Mall, Suite 1400
17                                    Sacramento, CA  95814
                                      By:  ALDEN JOHN PARKER
18                                    Attorney at Law

19
        Official Court Reporter:     Thresha Spencer,
20                                    CSR, RPR
                                      501 I Street
21                                    Sacramento, CA 95814

22

23      *Proceedings recorded by mechanical stenography, transcript
      produced by computer-aided transcription*
24

25

1                                    INDEX

2      PLAINTIFF'S WITNESS:

3      **RAQUEL ALFARO**
       DIRECT EXAMINATION BY MS. STA.ANA                    19
4      CROSS-EXAMINATION BY MR. PARKER                      29
       REDIRECT EXAMINATION BY MS. STA.ANA                  74
5      RECROSS-EXAMINATION BY MR. PARKER                    81

6

7
                              --o0o--
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        SACRAMENTO, CALIFORNIA, Thursday, July 7, 2022, 10:01 a.m.

2                                  --o0o--

3   (In open court.)

4             THE CLERK:  Case 22-civil-756; Martin Walsh versus

5   Che Garibaldi, et al.

6        Counsel, please state your appearances.

7             MS. STA.ANA:  I'm Jennifer Sta.Ana on behalf of the

8   United States Secretary of Labor.  Also with me is an

9   investigator of the Wage an Hour Division at the Department of

10  Labor's client agency, Raquel Alfaro.

11            MR. PARKER:  And good morning.  I'm Alden Parker.  I

12  represent the defendants in this matter.  I have an associate

13  of mine here today, Marco Rodriguez.  I also have two law

14  clerks from our office here today:  Daniela Contreras and

15  Melina Kazemzadeh.  Pretty close?  Okay, sorry about that.

16            THE COURT:  All right.  Well, this morning we're here

17  for consideration of the plaintiff's motion for a temporary

18  restraining order.  It asks also for an order to show cause why

19  a preliminary injunction should not issue.

20       So let's talk about the temporary restraining order now.

21  Ms. Sta.Ana, tell me more about this case.

22            MS. STA.ANA:  So, your Honor, simply put, this case

23  is a situation which we asked for a temporary restraining order

24  because we have heard from employees that defendants are

25  threatening employees with retaliation, specifically saying

1  that they will fire employees if they speak to U.S. Department

2  of Labor as well as misinforming the Department of Labor

3  stating that all the information that employees give to the

4  department will be sent to immigration authorities so that they

5  may be deported.

6       This situation is urgent, it also impedes on the Department

7  of Labor from progressing in this case as well as the judicial

8  process in trying to obstruct potential witnesses from coming

9  forward and speaking to us to tell us about what is happening

10  at defendant's workplace.

11            THE COURT:  When did you start to learn this

12  information?

13            MS. STA.ANA:  The most immediate threats of

14  termination and deportation occurred just a few weeks ago in

15  mid-June.

16            THE COURT:  So why did you wait until the afternoon

17  of the Friday before the three-day weekend to file this motion?

18            MS. STA.ANA:  We did talk to employees to try to

19  figure out whether or not what was being said was affected --

20  was affecting multiple employees, and so we were doing our due

21  diligence before filing.

22            THE COURT:  Have you identified these employees to

23  the defendant?

24            MS. STA.ANA:  We have not because of the government's

25  informant's privilege.

 1            THE COURT:  How do you expect the defendant to

 2    respond to these allegations?  They have actually literally

 3    hearsay on hearsay?

 4            MS. STA.ANA:  And in terms of the briefing and some

 5    of the case law that we have in Federal District Court,

 6    including the Ninth Circuit, the government informant's

 7    privilege is something that is respected especially when you're

 8    so early during litigation.  The government's informant's

 9    privilege has been uplifted when you're closer to trial.

10    Defendant's *Nuzon*, a case that we litigated at the Department

11    of Labor.  And that trial -- that trial was upcoming in two

12    weeks where witnesses were already being prepared for trial.

13    And here we're not even at the discovery phase.

14       Even at the discovery phase District Courts have said that

15    informant's privilege cannot be -- cannot be threatened in

16    order to protect the FLSA's enforcement.

17            THE COURT:  What about at the preliminary injunction

18    stage?

19            MS. STA.ANA:  At the preliminary injunction stage,

20    your Honor, we believe that it is far too early given the fact

21    that employees are so scared right now to testify and even come

22    forth, and that's why we have a declaration from our

23    investigator.

24            THE COURT:  The informant's privilege, as I

25    understand it, arises out of the *Roviaro* case, which is a

1    criminal case.  Apparently, the idea has been taken forward

2    into civil litigation, but it makes it very difficult for any

3    defendant to answer allegations when you say, "Somebody is

4    saying something, I'm not going to tell you who they are and

5    I'm not going to give you any information to help you identify

6    who they are."

7        Now, I understand that hearsay on hearsay is admissible if

8    it's reliable, but how is that kind of information reliable?

9            MS. STA.ANA:  So we do have a federal government

10   investigator who has trained to work up these cases.  And we do

11   have our investigator here today who is willing to testify to

12   try to explain, if you so choose, as to what she has heard from

13   workers and why the information that she has received is

14   something that is very worrisome to the department.

15           THE COURT:  Mr. Parker, what do you have to say about

16   this?

17           MR. PARKER:  I'll try to take that in reverse order,

18   your Honor.  I think it would be inappropriate for the

19   investigator to testify at this point.  They had their

20   opportunity to go ahead and present whatever evidence she saw

21   fit to present in this application already, and I think they're

22   married to what their application goes ahead and holds.

23           THE COURT:  But in that regard, wouldn't it be to

24   your advantage to be able to cross-examine that investigator?

25   You haven't been able to do that yet, apparently.

1              MR. PARKER:  It would be, your Honor.  Especially if

2     I'm allowed to inquire about the identity of the individuals,

3     but I don't believe I need that.

4         It is the plaintiff's burden here, and it's a high burden.

5     They have to demonstrate by a clear showing that they can meet

6     the four factors for a TRO.

7              THE COURT:  Let me ask you about that.  You're

8     talking about the *Winter* factors.

9              MR. PARKER:  Correct.

10             THE COURT:  They've cited some case law that I had

11    not seen previously to the effect that where the plaintiff asks

12    for an injunction in a case where a statute allows injunctive

13    relief that there's only one *Winter* factor, probability of

14    success on the merits, and they don't have to prove irreparable

15    harm.

16             MR. PARKER:  I saw that, your Honor, in the brief

17    amount of time that we had to do this.  We were contacted, by

18    the way, back in the middle of May with a threatening letter

19    about coming to the Court and seeking a temporary restraining

20    order.

21        The government then waited more than six weeks to go ahead

22    and submit the application when most of the evidence that they

23    submitted by unnamed hearsay declarants through the declaration

24    of the investigator, they've gone ahead and submitted that

25    information.  Most of it happened back in May, decreasing the

1  argument that there's some emergency situation here for a

2  temporary restraining order.

3      But when we look at the likelihood of success, they fail to

4  meet their burden by a clear showing which is absolutely their

5  requirement.  In fact, based on the evidence --

6          THE COURT:  No.  But you said they took you by

7  surprise.  They took me by surprise too because I had not

8  understood this concept, but I took a look at some of the

9  authority that they cite and other authorities which seems to

10  say that where injunctive relief is allowed by statute, even in

11  the context of a preliminary injunction, there is a presumption

12  of irreparable harm.  And the plaintiff doesn't have the burden

13  of showing irreparable harm.  What does that do to the *Winters*

14  test?

15          MR. PARKER:  You know, I think that it goes ahead and

16  shrinks overall.  My comment would be it shrinks the *Winters*

17  test to the likelihood of success, which they still have not

18  met in this case.

19          THE COURT:  All right.  Is this good law?  Are you

20  familiar with it?

21          MR. PARKER:  I am somewhat familiar with it.  Having

22  had a prescheduled family vacation, there was not enough time

23  to devote to this.  Our opposition was submitted at 10:30 last

24  night to the Court.

25      In that, what is notable I think for the Court on this one

1   factor that the department says is still relevant for this

2   injunctive relief that they're requesting is the likelihood of

3   success.  I believe on the merits it is actually the defendants

4   that have shown a likelihood of success on retaliation here.

5         We have direct evidence from people that are named

6   declarants that not only call into question the unnamed

7   declarant's hearsay statement, the statement that retaliations

8   were made.

9         We also have evidence -- direct evidence from witnesses

10  that say the investigator herself has incorrectly identified an

11  individual that doesn't exist.  One of the defendants, his last

12  name is not Rodriguez, it is Hernandez.  And this goes ahead

13  and calls into question the reliability of the investigator's

14  own notes, information, recollection of events, aside from the

15  fact that they're not actually from the declarants.

16        We have two individuals that were accused of making

17  statements that both directly under oath deny that that

18  occurred.  And the government, based on its thin evidence,

19  cannot meet their burden even if it is supposed to be only one

20  factor.  It's actually the defendants that have demonstrated a

21  likelihood on retaliation that they would succeed in this

22  matter.

23              THE COURT:  Ms. Sta.Ana, you've given the Court, I

24  presume, declarations from the investigator who interviewed the

25  witnesses, correct?

1          MS. STA.ANA:  Correct.

2          THE COURT:  Now why couldn't you at least have given

3     the Court expurgated declarations from the individuals

4     themselves that would at least eliminate one of the steps of

5     the hearsay objection?

6          MS. STA.ANA:  The workers are extremely fearful at

7     this moment.

8          THE COURT:  You can say that in any case.  You know,

9     I've had cases where immigrant employees will go to a

10    government agency and say anything they think will allow them

11    to stay in the United States.

12       We don't know whether these people are subject to

13    deportation, we don't know whether they're trying to cooperate

14    with the government in order to avoid deportation.  We don't

15    know a thing about them.

16       So for you to stand there and tell me they're extremely

17    fearful, I don't have any doubt on your good faith, but there's

18    no credibility in that statement.  You don't know how fearful

19    somebody else is, and your investigator doesn't know how

20    fearful they are.

21          MS. STA.ANA:  Our investigator is here today.

22          THE COURT:  Fine.

23          MS. STA.ANA:  And you're able to ask questions.  But

24    from what you see in the declaration, some of the workers were

25    crying to the point where they felt like they couldn't speak up

1    anymore.

2            THE COURT:  Maybe they were crying because they

3    thought they were going to be deported.  I don't know why they

4    were crying.

5        I had a gentleman in here yesterday that cried because he

6    thought he was going to go to prison and he did, but we don't

7    know why somebody is crying.

8            MR. PARKER:  Your Honor --

9            THE COURT:  So your answer to my question as to why

10   you couldn't provide expurgated declarations of individuals

11   themselves was that they were too scared to give a declaration.

12           MS. STA.ANA:  They were too scared, yes.

13           THE COURT:  Even though it might not disclose their

14   identity?

15           MS. STA.ANA:  In terms of disclosing their identity.

16   I mean, right now at issue is the fact that they feel like

17   they're going to be terminated or deported if they speak up.

18           THE COURT:  Anybody can say that.  I'm just giving

19   you an opportunity here, Ms. Sta.Ana, to give me more credible

20   evidence than what's already presented.  Because, as I told

21   you, I am fully aware of the fact that the Court can consider

22   hearsay on the motion for a temporary restraining order.  And

23   I'm fully aware that the hearsay, if it's to be considered, has

24   to be found to be reliable by the Court.

25       And I'm giving you fair warning that I am not inclined to

1    find this kind of testimony to be reliable for the reasons that

2    you and I are discussing right now, and I'm giving you the

3    opportunity to think about presenting it in a more reliable

4    way.

5        So with that in mind, I want to talk about the informant's

6    privilege.  What do you know about it, Mr. Parker?

7            MR. PARKER:  Your Honor, in the context of employment

8    cases, the informant's privilege seems to attach more readily

9    to cases where wage and hour violations are being alleged, and

10   the proof is going to be based on documentary evidence, that

11   it's been brought by an informant to the government, but most

12   of the time that is shielded in instances where you can

13   demonstrate based on documents alone the potential liability.

14       In instances like this where there's retaliation that's

15   dependent on what was said, that's dependent on how it was

16   said, that depends on whether someone was justifiably feared or

17   whether an adverse employment action occurred, all of those

18   things require actual testimony from a live person to

19   substantiate the factors necessary to demonstrate the claim.

20       And in those instances Courts have gone ahead and disclosed

21   the individuals.  You can see the plaintiff's overreach in

22   their own restraining order application where they ask that we,

23   the representatives of my clients, cannot go ahead and speak

24   with any workers about the substance of the litigation.  That

25   ties my hands to go ahead and not even be able to interview

1   people that I don't even know if they were an informant or not

2   to go ahead and discover whether retaliatory statements or

3   potential retaliatory statements are being made.

4       But counsel's own argument belies why this declaration is

5   unreliable.  She said there's been a threat of deportation.

6   Their own declaration does not say that.  Their declaration

7   goes ahead and states that there was a statement made that the

8   Department of Labor may be looking into their employment

9   status.  There was no call to any immigration authorities like

10  it was in the case that they cited in *Arias*.

11      This is a completely unreliable declaration that actually

12  misstates who the declarant was.  You can't rely on -- even if

13  hearsay is admissible and considered -- where you have to weigh

14  that hearsay.  It is completely unreliable when the declarant

15  doesn't even know who she's speaking with, who she is speaking

16  about, and who she's attributing the hearsay statement to.

17          THE COURT:  Now, Ms. Sta.Ana, I would have to

18  research the informant's privilege in a little bit more detail.

19  I don't know if Mr. Parker is correct in his assessment of when

20  it typically applies and when it does not.

21      But if your concern is that these informants would be

22  subject to retaliation, one of the things you're asking the

23  Court to do in your temporary restraining order is to enjoin

24  retaliation.  So they should not have to be concerned about

25  retaliation, they've got the protection of the Secretary of

1    Labor and they've got the protection of the Court.

2       If they're concerned about deportation, the defendant can't

3    deport them, only the government can deport them.  You are the

4    government here.  You're the Department of Labor.  You're not

5    the Department of Homeland Security, but there's nothing the

6    defendant here can do to deport them.

7       So I don't see why there's this concern that you seem to

8    have for their safety under those circumstances.  Why can't you

9    ask the Court to enjoin retaliation, and if that injunction is

10   issued, then you can disclose the identity of those people to

11   the defendants so they can get a little due process.

12          MS. STA.ANA:  I will refer the Court to *Nuzon*,

13   actually, in this situation.

14          THE COURT:  To what?

15          MS. STA.ANA:  *Acosta v. Nuzon* in the Central District

16   where in a preliminary injunction and temporary restraining

17   order situation, in fact, the declaration of investigator was

18   indeed sufficient enough to show that a temporary restraining

19   order should be imposed as well as unforgettable coding in the

20   District of Nevada.

21          THE COURT:  Well, maybe it was in that case to that

22   judge, but this Court is no more bound by the decisions of that

23   judge than that judge is bound by my decisions.

24      I'm suggesting to you what -- in the circumstances of this

25   case -- might be credible evidence for the Court to consider.

1    Now, answer my question.  I don't care what the other judge

2    did.  Answer my question in this case.  What are you concerned

3    about if the Court were to enjoin retaliation, what would you

4    be concerned about giving the identity of those complaining

5    witnesses to the defendant so they can defend themselves in

6    this case?

7          MS. STA.ANA:  I think there's just no case law that

8    we can turn to where it's so early on in litigation where a

9    federal government has exposed the names of informants who are

10   trusting of the federal government to protect them in the

11   future and in the long run.

12   And when we have a situation where it's right now unknown

13   how defendants are going to react, we are just not even at the

14   stage where there's been a response from defendants in this

15   litigation.  And we've seen at multiple District Courts, even

16   at the discovery phase of litigation, where it's too early to

17   expose the name of informants.

18          THE COURT:  Well, I'll tell you what I'm inclined to

19   do, and then you can take it from there.  If that's your

20   position at this stage, I'm not going to be inclined to be so

21   tough as to emphatically arbitrarily say, "You turn the

22   identity of those people over to the defendant."

23   But I think I can tell you that if you don't give them the

24   identity of those people so they can talk to them or take their

25   depositions, I'm not going to give much credibility to the

1   hearsay-on-hearsay statements that you've presented from those

2   unknown people.  So you can take it from there.

3              MS. STA.ANA:  Would it be okay with the Court if we

4   do some briefing when it comes to the informant's privilege

5   since we did not?

6              THE COURT:  It's always appropriate to give me

7   briefing on anything that you think is relevant.  And I have no

8   doubt that you're going to be able to show me cases in other

9   districts where judges have declined to require the disclosure

10  of the names of complaining witnesses at an early stage.  I

11  have no doubt that you're probably going to find me some cases

12  from the Ninth Circuit that have affirmed that.

13     But I think also I could point to cases where district

14  judges have been given the discretion not to believe hearsay

15  testimony when they didn't find it was reliable.

16     So right now I am not going to grant a temporary

17  restraining order because you haven't shown me anything that

18  you think is going to happen between now and the time we could

19  have a hearing on a preliminary injunction that would upset the

20  status quo to require a court order.

21             MS. STA.ANA:  Right now, your Honor, the employees

22  have not spoken to the Department of Labor as often because

23  they're so afraid that they will be retaliated against, and

24  that impedes our ability to move forward with this case.

25             THE COURT:  I will tell you right now, I do not

1    believe that.  I will tell you that right now.  Now, it may be

2    true, but the evidence you've given me to prove that is not

3    credible.  The evidence you've given me to prove that is you

4    standing right here telling me repeatedly that these people are

5    afraid.  You're not telling me who they are, you're not telling

6    me -- call your witness.  I know you didn't want him called,

7    but let's hear what he has to say.  You can cross-examine him

8    or her.

9              MR. PARKER:  Thank you, your Honor.

10             THE COURT:  Call your witness.  See if he can

11   persuade me that these people are so afraid that they need a

12   temporary restraining order between now and the time that you

13   can have a full hearing on the motion for a preliminary

14   injunction.

15        And I'm telling you right now if you want that hearing

16   between now and -- what's the trial date that I have, Karen?

17             THE CLERK:  One moment, your Honor.  July 26th.

18             THE COURT:  Between now and July 26th I can give it

19   to you, and that trial is going to last two weeks.  And I've

20   promised them every working hour of every day for that trial

21   until it's over, and so that would have to be August the 15th

22   or 16th.  So I can't hear the preliminary injunction between

23   July the 26th and August the 12th, but I can hear it before

24   then and I can hear it after then.

25        So I want to know why it is that you need a temporary

1   restraining order.  You know, when you didn't -- you didn't

2   even ask for it to be heard.  When was it they said they wanted

3   to be heard, Karen?

4            THE CLERK:  It was noticed for July 11th, your Honor.

5            THE COURT:  So you noticed it -- you noticed it for

6   next week.  So, obviously, you didn't think anything was going

7   to happen between now and next week.

8            MS. STA.ANA:  I did on the papers request the

9   earliest possible, but understood that defendant did request

10  the week of July 11th.  And being as mindful and respectful of

11  that request I put it for the ECF system, but in the briefing

12  it's either that or the very earliest the Court can hear.

13           THE COURT:  All right.  So you really haven't

14  persuaded me why you waited until the Friday before the holiday

15  weekend to file it, but I'll accept your representation that

16  you think that was timely.  That's incidentally a pretty cheap

17  trick to file a motion for a TRO at 3:00 o'clock in the

18  afternoon on a Friday before a three-day weekend.

19       So call your witness.

20           MS. STA.ANA:  I call Raquel Alfaro up to the stand.

21           THE CLERK:  Please step forward.  All the way up to

22  the witness stand and remain standing and face me.

23       (The Witness, RAQUEL ALFARO, is sworn.)

24           THE WITNESS:  I do.

25           THE CLERK:  Thank you.  You may be seated.  Please

 1    state your full name, spell your last name for the record.

 2             THE WITNESS:  Raquel Alfaro.  A-L-F, as in Frank,

 3    A-R-O.

 4             THE COURT:  You may proceed.

 5                      DIRECT EXAMINATION

 6    Q.  BY MS. STA.ANA:  Ms. Alfaro, where do you currently work?

 7    A.  For the Department of Labor, Sacramento District Office.

 8    Q.  And what position do you hold at the Department of Labor?

 9    A.  I'm a wage and hour investigator.

10    Q.  As a wage and hour investigator, what do you do?

11    A.  Conduct investigations to enforce compliance with various

12    labor laws.

13    Q.  As an investigator, what is your role in the matter

14    regarding Che Garibaldi?

15    A.  I am the lead investigator.

16    Q.  As a lead investigator in the matter, what is your role

17    with regards to speaking with employees?

18    A.  My role in speaking with employees is to conduct

19    investigation -- sorry, interviews.

20    Q.  So during these interviews, what information did you

21    receive from employees at the beginning of your investigation?

22    A.  From the beginning of the investigation, employees told me

23    that they were told to --

24             MR. PARKER:  Your Honor, if I could impose an

25    objection.  It's hearsay.

1          THE COURT:  Yes, you may.  It's not only hearsay, but

2     when you're going to say that somebody told you something, you

3     have to say when they told it to you, where you were when they

4     told it to you, who was present, and what they said.

5          MS. STA.ANA:  So we were -- so, again, I'm going to

6     call the informant's privilege and would request a brief

7     writing.

8          THE COURT:  Look, how much litigation experience do

9     you have?

10         MS. STA.ANA:  I have about seven.

11         THE COURT:  Seven trials?

12         MS. STA.ANA:  I have had one trial.

13         THE COURT:  Okay.  Even with the most liberal

14    requirements for admissibility, you can't have a witness say

15    "people told me this" and not lay the foundation as to when,

16    who was present, or anything like that.  If you want me to

17    believe that, you might as well have me believe you've got some

18    nice property waterfront in Arizona to sell me.  Because that

19    kind of testimony is never going to be credible.

20         MS. STA.ANA:  I was trying to go to party admission

21    and state of mind, but I can build up more foundation if you

22    prefer.

23         THE COURT:  All right.  I'm not even going to sustain

24    the objection.  If she wants to say that -- I'm giving you the

25    benefit of my thinking.  I'm just telling you I'm not going to

1   find it credible.

2              MS. STA.ANA:  Well, we can start from the very

3   beginning of the investigation if you prefer, your Honor.

4              THE COURT:  You do what you want to do.

5   Q.  BY MS. STA.ANA:  When did you start the investigation?

6   A.  The investigation was initiated in May of 2021, I believe.

7   Q.  And in terms of the start of the investigation in May 2021,

8   what was the first thing that you did?

9   A.  The first thing I did was contact Mr. Eduardo Hernandez,

10  the employer.

11  Q.  And in that conversation, what was exchanged between you

12  and Mr. Hernandez?

13             MR. PARKER:  Your Honor, that's vague and overbroad

14  as to the subject matter of the investigation.  They seem to be

15  looking to establish facts relating to the wage and hour

16  portion of their claims and not limited to retaliation.

17             THE COURT:  Well, we'll hear what they have to say.

18  Overruled.

19             THE WITNESS:  Can you repeat the question?  I'm

20  sorry.

21  Q.  BY MS. STA.ANA:  And what was exchanged between you and

22  Mr. Hernandez?

23  A.  I informed him that I was initiating the investigation,

24  that I would be sending him an appointment letter with a

25  records request.  And he agreed to send me the records

1    requested to initiate the investigation.  I also informed him

2    of the investigative process.

3    Q.  And after that conversation with Mr. Hernandez, what was

4    the next thing that you did?

5    A.  I believe the next thing I did after that was -- well, I --

6    until I received the records from him, that's when I initiated

7    reviewing the records provided and contacted employees via

8    telephone.  Because of COVID, we conducted the investigation

9    mostly over the phone, and he provided me with a list of

10   employees and their phone numbers.

11   Q.  And how many employees did you speak with?

12   A.  Roughly, I would say more than ten.

13   Q.  In these conversations with employees, what was told to you

14   in terms of your investigation?

15            THE COURT:  Well, again, you can ask that question,

16   but unless you say some person actually said that -- okay, go

17   ahead.  I've given you enough of my thinking to know what's

18   going to work and what isn't going to work for you.  If this is

19   the way you want to ask the question, go ahead and ask the

20   question.

21       This is -- these are a number of conversations, probably

22   more than ten, that she had over the phone.  No verification as

23   to how she determined that the person that she was talking to

24   was, in fact, the person she thought she was talking to.  No

25   determination as to how many times this was said, just a

1    general gist of what was said to her over the course of more

2    than ten telephone conversations.  That's your question.  I'll

3    hear the answer.

4    Q.  BY MS. STA.ANA:  We can start with how did you determine

5    that these were employees?

6    A.  Eduardo Hernandez sent me the list of the employees with

7    their telephone and contact information.

8    Q.  And did you use those telephone numbers to contact the

9    people on that list?

10   A.  Correct, I did.

11   Q.  And you spoke to ten individuals?

12   A.  Roughly, around that number.  Could be more.

13   Q.  So in your recollection, and you can go from the very first

14   employee that you talked to, what was communicated to you?

15              MR. PARKER:  Objection, your Honor.  Lacks foundation

16   and hearsay.

17              THE COURT:  Okay.  So this is the first employee.

18   She's going to talk now about what the first employee said,

19   right?

20              MS. STA.ANA:  Correct.

21              THE COURT:  Okay.

22              THE WITNESS:  I was told by the employee that Eduardo

23   and Alejandro told employees to tell the Department of Labor

24   that they worked only 40 hours a week, that they did not work

25   overtime, that they took breaks, that they did not have to pay

1    for their uniforms.  And also they told me that -- the

2    employees told me that Eduardo had said that the employee --

3    the employees owed him for giving them work and that -- that

4    it's their turn -- the employees' turn now to return the favor

5    in helping them with this investigation by lying to the

6    Department of Labor.

7              MR. PARKER:  Your Honor, I'll object and move to

8    strike everything after the first sentence.  The witness

9    strayed from the question about the first employee she talked

10   to and started to talk about the employees en masse.

11             THE COURT:  I don't know if that's what she was

12   saying.  I interpret her to be saying that employee number one

13   was purporting to tell her what the defendants had said to

14   other employees.  That's the way I understood what she said.

15       Now, no representation as to how employee number one would

16   have known what the defendants told other employees, but that's

17   what they want to offer.

18   Q.  BY MS. STA.ANA:  In terms of employee number two, if you

19   can recall, what was communicated to you?

20   A.  I honestly can't recall who number two was, but I do know

21   that it was -- I can't recall, I don't want to say because I

22   don't remember who I spoke with after number one.

23   Q.  With what you provided what employee number one shared with

24   you, did you hear that information again from any other

25   employee that you interviewed?

1   A.  I did.

2   Q.  And how many would you say?

3   A.  I would say more than five employees.  For sure more than

4   five, possibly more.

5   Q.  Is there anything else that you can recollect that employee

6   number one told you?

7   A.  Employee number one also informed me at a later time that

8   the employer, Eduardo Hernandez, brought in a priest who was a

9   friend of Eduardo Hernandez to hold confessions at the

10  establishment in the back of the restaurant.  And multiple

11  employees told me that they took part in this confession, and

12  they found it odd because the priest was asking questions

13  regarding their loyalty to the employer and to the business.

14  Q.  And when can you recall that information being shared to

15  you?

16  A.  That is tough.  I know it was before May 2022, but I don't

17  remember -- I don't recall the exact month that they informed

18  me of this.

19  Q.  And as your role as an investigator, the information that

20  employee one shared with you that was shared with you by

21  multiple employees as well as what you have shared about this

22  priest.  As your role as an investigator, what were your

23  thoughts?

24  A.  I thought that it was a form of -- of -- what's the word --

25  intimidation that the employer was using to intimidate the

1   employees to keep them from talking to the Department of Labor.

2   Q.  After the Secretary filed his complaint in May 2022, did

3   you hear from workers again?

4   A.  I did.

5   Q.  And what did they tell you?

6           MR. PARKER:  Your Honor, they're asking about all the

7   employees that she contacted.

8           THE COURT:  That's the way she wants to do it.  I'm

9   through trying to educate her.  That's the way she wants to ask

10  the question.  I'll hear whatever they want to present.

11     Go ahead.

12          THE WITNESS:  Can you repeat the question, please.

13  Q.  BY MS. STA.ANA:  After the Secretary filed their complaint

14  in May 2022, did you hear from the employees?

15  A.  I did.

16  Q.  Okay.  So we can start with the first employee that

17  contacted you at that time.

18  A.  Okay.

19  Q.  What do you remember from that conversation?

20  A.  The first employee that contacted me let me know that

21  Alejandro was very upset because of the complaint and because

22  of the news coverage that the complaint had, and told the

23  employee and others that if -- to not speak to the news, to not

24  speak to the Department of Labor.  That because of this

25  complaint now their immigration status was going to be

1   compromised, and that they need to learn to be quiet.

2       Also said that this is -- this is -- this should not be

3   used as a way to get easy money, and that the employee should

4   be grateful for Eduardo because this is the -- the money that

5   they're making at the restaurant is what they eat off of.  It's

6   kind of lost in translation from Spanish to English, but

7   basically they need their job to survive.

8   Q.  Did the workers tell you where those statements -- who made

9   those statements?

10  A.  Alejandro.

11  Q.  Was there another employee that reached out to you after

12  the complaint was filed?

13  A.  Yes.

14  Q.  Can you recall what was shared with you with that employee?

15  A.  That employee informed me that Alejandro had told them not

16  to speak to anybody from the news as well and to not speak to

17  the Department of Labor.  That -- to not speak to the news, to

18  not speak to the Department of Labor.  That if they did that

19  they would be terminated.

20  Q.  And did another worker approach you after that employee?

21  A.  I did speak with another employee after that.

22  Q.  And what was shared?

23  A.  That employee also informed me that Alejandro was very

24  upset, that everybody at the restaurant was nervous and scared

25  because Alejandro was very upset.  And that Alejandro

1   repeatedly told everybody not to speak to anybody from the news

2   or from the Department of Labor, and that they would be

3   terminated if they spoke with the Department of Labor.

4   Q.  After that third employee, did you speak to another?

5   A.  Yes.

6   Q.  And what did that fourth employee tell you?

7   A.  That employee also told me the same thing, that Alejandro

8   was upset and to not -- that Alejandro said not to speak to

9   anybody from the Department of Labor or to the news.

10  Q.  After that fourth employee, did you speak to another

11  employee?

12  A.  I'm not -- I'm not sure.

13  Q.  Am I correct that these were conversations that happened

14  after the complaint was filed?

15  A.  Correct.

16  Q.  After -- after that time period, did employees contact you

17  again?

18  A.  Yes.

19  Q.  And when was that?

20  A.  It was last month, in June.

21  Q.  Do you know when approximately in June?

22  A.  It was either mid-June or early June.

23  Q.  And what -- how many workers did you talk to in June?

24  A.  One.

25  Q.  And what did that worker tell you?

1   A.   That employee told me that Alejandro told employees that

2   the investigation with the Department of Labor was over.  That

3   Eduardo's attorneys were taking over the investigation, and

4   that any information the Department of Labor obtained was going

5   to be forwarded to immigration.

6        And also said -- Alejandro said -- I'm trying to think of

7   exactly how he said it.  That why would the Department of Labor

8   help you if you guys are illegals.

9   Q.   While you were speaking to the employee, what in your

10  opinion was the state of mind of that worker?

11  A.   That employee was very scared.  I could hear it in the

12  employee's voice.  I asked the employee if they would testify

13  to this information, but that employee was too scared to do

14  that.  That employee was at the point of crying, and that's not

15  the only employee that has cried to me about this matter.  But

16  that employee said that this situation is getting worse and

17  that everybody is very scared and afraid at the restaurant.

18            MS. STA.ANA:  I have no further questions, your

19  Honor.

20            THE COURT:  Mr. Parker, you may cross-examine.

21            MR. PARKER:  Thank you, your Honor.

22                      CROSS-EXAMINATION

23  Q.  BY MR. PARKER:  Ms. Alfaro, how long did you spend

24  preparing for today's hearing?

25  A.   For today?  Not long.

1    Q.  Okay.  You had access to your investigation file to

2    prepare?

3    A.  I did not have a chance to look at my investigation file.

4    Q.  Okay.  You did submit a declaration in support of the

5    application, right?

6    A.  Correct.

7    Q.  And how long did you spend going ahead and reviewing that

8    document and making sure it's accurate before you signed it

9    under penalty of perjury?

10   A.  I reviewed it -- I don't know, like -- I reviewed it for

11   accuracy and -- I don't know.  Once I knew that everything that

12   was on there was correct, I submitted it.

13   Q.  Did you spend an hour reviewing it for accuracy?

14   A.  Possibly.

15   Q.  Okay.  More?  More than an hour?

16   A.  I would say -- I mean, altogether collectively, probably

17   two hours.

18   Q.  Okay.  How about providing the information for the

19   declaration?  Did you spend additional time providing the

20   information that would end up in this declaration?

21   A.  The information I was provided was collected over -- I had

22   it all in my notes.

23   Q.  Okay.  And you had access to these notes when you prepared

24   and then reviewed this declaration for accuracy, right?

25   A.  Correct.

1  Q.  Okay.  So can you tell me why you didn't put in that

2  declaration that there was a statement "immigration status

3  would be compromised"?

4  A.  Can you repeat that?

5  Q.  Yeah.  In signing this declaration you meant to provide the

6  Court with useful information for the Court to assess this

7  application for a temporary restraining order, right?

8  A.  Yes.

9  Q.  All the information that you felt would weigh on the

10  Court's decision, correct?

11  A.  Correct.

12  Q.  You signed it under penalty of perjury and did not contain

13  a statement the immigration status would be compromised, did

14  it?

15  A.  I'd have to look at the statement.

16  Q.  Now you're testifying under oath, without your notes in

17  front of you, that that statement was made, right?

18  A.  I'd have to look at the statement to see what's in there.

19  Q.  I heard your statement correctly, right?  You are now

20  alleging that someone told you that an employee of my client

21  made a statement, "Your immigration status is going to be

22  compromised," right?

23  A.  Maybe I didn't say it correctly or in the words exactly

24  like the employee told me, but that was the basis of what was

25  said.

1   Q.  So some of the testimony you've offered is not what the

2   employees actually told you?

3   A.  No, everything is what they told me.  I'm saying I may have

4   phrased it differently from exactly how the employee told me.

5   Q.  You've phrased it differently from what the employee

6   actually said?

7   A.  Also --

8   Q.  Hold on, ma'am.

9   A.  Uh-huh.

10  Q.  My question is:  You have gone ahead and taken the words of

11  the employee and then changed them in your testimony, correct?

12  A.  No.  So when I spoke with employees also, it was in

13  Spanish.  So some words do not translate identically in

14  English, so...

15  Q.  So was the statement made by someone that they were told

16  your immigration status would be compromised?

17  A.  Yes.  They said -- they mentioned immigration.  The

18  employers mentioned immigration to the employees on various

19  occasions in various phrases and various different manners.

20  Q.  Right.  But you put those phrases in your declaration,

21  right?

22  A.  Uh-huh.

23  Q.  The ones that your notes reflected were actually made,

24  correct?

25  A.  Correct.

1  Q.  And that statement was actually the Department is

2  collecting this information and sending it to immigration,

3  right?

4  A.  Correct.

5  Q.  And why would the Department care about you because you're

6  illegal, right?

7  A.  Correct.

8  Q.  They did not say, "Your immigration status is going to be

9  compromised if you support the Department," correct?

10  A.  Like I said, I'm not -- the employees told me multiple

11  times, multiple phrases, multiple conversations they've had

12  with the employers regarding their immigration status, their

13  immigration status being compromised, and -- yeah.

14  Q.  Ma'am, you speak Spanish, right?

15  A.  Correct.

16  Q.  You were speaking directly to them in Spanish?

17  A.  Correct.

18  Q.  No employee said their immigration status would be

19  compromised, did they?

20  A.  Not in those --

21  Q.  Then why did you testify and tell your own attorney that

22  they did?

23  A.  In English, you mean?  Because they said it to me in

24  Spanish.

25  Q.  In whatever language they communicated with you in.

1   A.   They did say that to me in Spanish.

2   Q.   You just told me they didn't say it.  So first you tell

3   your attorney they did say it, then you testify under oath they

4   didn't say it, and now you're saying again they did?  And you

5   expect the Court to believe you; is that correct?

6           THE COURT:  Well, that's argumentative.

7   Q.   BY MR. PARKER:  Why do you keep changing your statement

8   regarding that?

9   A.   I'm not changing my statement.

10  Q.   Which number employee made that statement to you?

11  A.   I'd have to look.

12  Q.   What date was the statement made on?

13  A.   I would have to look as well.

14  Q.   Why didn't you bring your file with you?

15  A.   I don't have an answer for that.

16  Q.   Why didn't you include that specific information in your

17  declaration?

18          THE COURT:  Ms. Sta.Ana, is her file here in the

19  courtroom?

20          MS. STA.ANA:  It is not, your Honor.

21          THE COURT:  Well, you offered to call her and you

22  knew what the issue was at this hearing.  I would have thought

23  you would have had her bring her file -- or you would have

24  brought your copy of her file so it could be used in the course

25  of this hearing.

1          MS. STA.ANA:  The file would require extensive

2    redactions because of government privileges.

3    Q.  BY MR. PARKER:  Ms. Alfaro, do you remember the gender of

4    the statement -- of the individual that said the immigration

5    status was compromised?

6          MS. STA.ANA:  Objection.  Relevance.

7          THE COURT:  Overruled.

8          THE WITNESS:  Yes.

9    Q.  BY MR. PARKER:  Okay.  Were you on the phone with the

10   person?

11   A.  Yes.

12   Q.  Okay.  Not by video?

13   A.  No.

14   Q.  So you don't know what the person looks like?

15   A.  I do know what the person looks like.

16   Q.  Okay.  Could you describe her for me, please.

17   A.  Hispanic female.

18   Q.  Okay.  Height?

19   A.  Average height.

20   Q.  Okay.  Color of the hair?

21   A.  Brown.

22   Q.  How long is her hair?

23   A.  I don't know.  It was up.

24   Q.  Did she wear glasses?

25   A.  No.

1          MS. STA.ANA:  Your Honor, again, objection.

2   Relevance.

3          THE COURT:  Well, it might be a way that he's trying

4   to get through the privilege.  We haven't litigated that

5   privilege yet.  I'm going to reserve that for a later time, so

6   I'm going to stop you right there.  She says she remembers the

7   person is a female.  You didn't ask her how she knows what the

8   person looked like, but she talked to her on the phone.  I'm

9   assuming she's going to say she saw the person at another date.

10  Q.  BY MR. PARKER:  You've interviewed this person in person?

11  A.  No.  I visited the establishment prior to interviewing the

12  person.

13  Q.  And you observed her?

14  A.  Correct.

15  Q.  How did you know she was the person that you later spoke

16  to?

17  A.  Well, she identified herself to me.

18  Q.  By name?

19  A.  When I spoke with her.

20  Q.  The names on the list that the employer voluntarily

21  provided you?

22  A.  Correct.

23  Q.  The employer voluntarily produced documents you requested

24  and an entire list of employee names and addresses and contact

25  information, correct?

1    A.   And inaccurate time cards as well.

2    Q.   And you would say that based on that, the employer

3    cooperated with you, correct?

4    A.   Not necessarily, because the employer provided me with

5    inaccurate time cards and did not provide me with the requested

6    time cards for the timekeeping system that he told me that he

7    did not use which we were able to subpoena records for and

8    indicated that he did use those records.

9    Q.   So they cooperated in part, correct?

10   A.   Partially.

11   Q.   And, in fact, the witnesses that you talked to that went

12   ahead and said that there are what you feel are wage and hour

13   issues at the establishment, there were also employees that

14   told you the opposite of that, right?

15   A.   Correct.

16   Q.   I mean, your declaration says "I received contrary

17   information from other workers, including that the information

18   I received about workers not working over 40 hours per week was

19   not accurate," correct?

20   A.   Correct.

21   Q.   How many of those were there?

22   A.   Less than the number of interviews that I have stating

23   otherwise.

24   Q.   How many less?

25   A.   I don't know the -- I don't know the exact number.

1    Q.  Why didn't you include those numbers in your declaration so

2    the Court could know and weigh how many people are saying there

3    is an issue versus how many people are saying there's no issue?

4    A.  I don't have an answer for that.

5    Q.  The people that are supporting the employer aren't fearful

6    of retaliation, right?

7    A.  I wouldn't necessarily say that, because some of the

8    employees that gave me these contradictory statements did come

9    to me later and tell me they were told to tell me otherwise.

10   Q.  Not all of them did, right?

11   A.  Not all.

12   Q.  So the employees that said -- and gave you information that

13   said the reporting of hours is correct and did not tell you

14   about any fear of retaliation, what are the names of those

15   people?

16          MS. STA.ANA:  Objection, your Honor.

17          THE COURT:  Well, they're not in fear of anything,

18   are they?

19          MS. STA.ANA:  It's unclear whether or not they are

20   stating comments or statements on their own accord.

21          THE COURT:  I want to --

22          MR. PARKER:  Your Honor, that's another way to say

23   they don't know whether they are or not.

24          THE COURT:  Right.  I'm going to overrule the

25   objection.  Even if you can persuade the Court of the

1   informant's privilege and if it's based on their fear, and

2   you've shown no suggestion that the individuals that he's

3   asking about have any fear of anything, just the opposite.

4        I'm going to overrule the objection.

5             THE WITNESS:  Well, I don't have the names of the

6   employees right now at the top of my head.

7   Q.  BY MR. PARKER:  You don't remember a single one?

8   A.  No.  Honestly, I don't.  I've worked many cases since that

9   case and I've interviewed multiple people.  I would have to

10  look at the list of the employees, and then I can possibly tell

11  you.

12  Q.  You don't even remember any of the names of the employees

13  that told you they were fearful?

14  A.  No.  I know names, I just don't know the names of all the

15  employees that I interviewed.  I'd have to look at the list,

16  and then I can identify that if I need to.

17  Q.  Well, you don't know the name of Alejandro, right?

18  A.  So I believe Alejandro's last name is Alejandro Hernandez

19  Rodriguez, and that's why it is Rodriguez in the statement.

20  Q.  Then why didn't you include that in your declaration?

21  A.  I don't have an answer for that.

22             THE COURT:  Wait a minute.  Is Alejandro one of the

23  people she interviewed or is he one of the defendants?

24             MR. PARKER:  He's one of the defendants, your Honor.

25  He was identified as a person making these statements, and he's

1   testified in his own --

2           THE COURT:  Wait a minute.  Alejandro is one of the

3   defendants, and he's one of the persons complaining about --

4           MR. PARKER:  No.  He's one of the people that is

5   alleged to have made comments that the Department feels are

6   retaliatory.

7           THE COURT:  All right.

8           MR. PARKER:  But she got the name wrong in the

9   declaration, as pointed out by Alejandro Hernandez's

10  declaration.

11          THE COURT:  Well, it's typical that Hispanic

12  individuals will have two names, their mother's name and their

13  father's name.  I think what she's saying is his name is

14  Alejandro what?

15          THE WITNESS:  Hernandez Rodriguez.

16          THE COURT:  Hernandez Rodriguez.  One of his mother's

17  name, one is his father's name, right?

18          THE WITNESS:  I didn't ask him that, but that's the

19  name that was given to me.

20          THE COURT:  All right.

21  Q.  BY MR. PARKER:  And Ms. Alfaro, you're familiar that

22  culturally there may be two surnames, right?

23  A.  There could be.

24  Q.  And that if you're formally addressing people, you're going

25  to address them by both of those surnames, correct?

1    A.  Well --

2            MS. STA.ANA:  Your Honor, relevance.  She's already

3    corrected --

4            THE COURT:  Okay.  I think I understand where this

5    is, so I think we can go on to another subject.

6        I understand what Mr. Parker is saying and I also

7    understand what she's saying so -- I don't think we need to

8    pursue that question any further.

9    Q.  BY MR. PARKER:  Ms. Alfaro, your investigation began in May

10   of 2021, right?

11   A.  Yes.

12   Q.  Over a year ago, correct?

13   A.  Yes.

14   Q.  You've been talking with employees at the restaurant for

15   over a year, correct?

16   A.  Correct.

17   Q.  You're aware that no one has been fired during that time,

18   right?

19   A.  I don't know that that's true.

20   Q.  Well, did you read the declaration that I submitted?

21   A.  I read it, but I don't know that it's true.

22   Q.  The declaration by someone who actually puts their name on

23   it.  Did you read that one?

24   A.  I did.

25   Q.  Okay.  Are you aware that no one has been reported to ICE

1    or some immigration authority?

2    A.   I don't know.

3    Q.   Did you see that the declarations by people that actually

4    will sign their name to it that supposedly made statements deny

5    the fact that they went ahead and made any of those statements?

6    A.   So I read that Hector wrote a declaration, but I never said

7    or I was never told that Hector made any statements.  Eduardo

8    Hernandez is the one that made these threats and allegations --

9    and statements to the employees, and there's no declaration

10   from Eduardo.

11           THE COURT:  Is that right, Mr. Parker?

12           MR. PARKER:  I don't believe that's what your

13   declaration says, does it?

14           THE WITNESS:  I believe it does say that Eduardo and

15   Alejandro are the two employers that were making these

16   statements to the employees.

17   Q.   BY MR. PARKER:  Alejandro Hernandez Rodriguez, correct?

18   A.   Correct, and Eduardo.

19   Q.   And so it wasn't just Eduardo, as you just testified, it

20   was Alejandro as well?

21   A.   Correct.  But --

22   Q.   And you read his declaration which said he didn't make

23   those statements, correct?

24   A.   I did read it.

25   Q.   As a trained investigator, do you give that any weight?

1  A.  Because of the information that Alejandro gave me during my

2  investigation which contradicted the evidence I was able to

3  substantiate that they were working more than 40 hours.  His

4  credibility is -- is not -- doesn't hold much weight for me.

5  Q.  So the answer to my question is, yes, you give it some

6  credibility, correct?

7  A.  I don't believe that's what Alejandro said in his

8  statement.

9  Q.  Do you give it -- as a trained investigator, a statement

10  where someone denies making the other statement, you give zero

11  credibility to; is that what I'm understanding now?

12  A.  I gave it consideration, but I do not believe his

13  statement.

14  Q.  Okay.  So you gave it consideration.  Just like the

15  statements by employees that said there weren't any wage and

16  hour problems, you gave that consideration as well, right?

17  A.  Correct.

18  Q.  You gave it some degree of weight, right?

19  A.  Correct.

20  Q.  You ultimately rejected it?

21  A.  Correct.

22  Q.  Okay.  The first employee you spoke to, what date was that

23  in May?

24  A.  I don't have a date.

25  Q.  Was that by phone?

1   A.  Yes.

2   Q.  How long did it last?

3   A.  I don't know.

4   Q.  Did you start at the top of the list and just go down?

5   A.  No.

6   Q.  Why did you pick that person then if it wasn't at the top

7   of the list?

8   A.  Eduardo gave me multiple lists for multiple locations, and

9   I don't -- I just called numbers on the list.  I don't know.

10   Q.  Well, which location was it?

11   A.  Howe.

12   Q.  Okay.  And so did you start at the top of the list for

13   Howe?

14   A.  I don't recall if I started from the top of the list.  I

15   just know that I called employees from the list.

16   Q.  And was it a female or a male?

17   A.  You asked me.  It's a female.

18   Q.  Okay.  But you had never met this person before?  You had

19   never seen them?

20         MS. STA.ANA:  Asked and answered.

21         THE COURT:  Overruled.  I want to make sure -- I'm

22   thinking of the same person that he is.

23     Go ahead.

24         THE WITNESS:  Can you repeat the question?

25   Q.  BY MR. PARKER:  Was this the same Hispanic female that you

1    had observed when you went into the location?

2    A.  Correct.

3    Q.  And you don't know how long that conversation lasted?

4    A.  No.

5    Q.  And you took notes?

6    A.  Correct.

7    Q.  You didn't record it?

8    A.  No.

9    Q.  She wasn't under oath?

10   A.  No.

11   Q.  During the first statement she didn't say anything about

12   statements that were allegedly retaliatory?

13   A.  No.

14   Q.  And how long before you contacted a second employee?

15   A.  I don't know.

16   Q.  I heard your testimony that you don't remember what that

17   person said.  What's the breakdown of males versus females in

18   terms of the ten or so employees that made -- that attributed

19   statements to Alejandro?

20           MS. STA.ANA:  Objection.  Relevance.

21           THE COURT:  I'm going to sustain it for now because

22   it's -- it's related to the question of the informant's

23   privilege which I'm going to address in more detail later.

24           MR. PARKER:  But, your Honor, it goes -- if I can

25   make an offer.  It goes to the reliability of the witness's

1    memory without her notes here, without any sort of filing.  She

2    doesn't seem to remember much other than the statements she

3    attributes to unnamed individuals that somehow harmed my

4    client.

5              THE COURT:  I know.  That's true, but it also is a

6    back doorway of trying to determine who these individuals are

7    which I'm not going to go into today.

8    Q.  BY MR. PARKER:  Ms. Alfaro, there were employees that told

9    you there weren't statements made threatening their immigration

10   status, right?

11   A.  No.

12   Q.  There were no employees that said that?

13   A.  No.

14   Q.  You asked your investigator in retaliation, right?

15   A.  So these questions about immigration came about after, and

16   the employees reached out to me to inform me, and that's how I

17   was aware of the -- the threats about immigration.

18   Q.  What do you mean "after"?

19   A.  After the complaint was filed.

20   Q.  Okay.  So only since the complaint these supposed

21   statements have been made?

22   A.  The statements about the Department of Labor gathering

23   information to send to immigration.

24   Q.  The statements that you feel were threatening toward

25   employees?

1   A.   Correct.

2   Q.   That only happened after the complaint was made?

3   A.   It heightened after the complaint was made.  It wasn't

4   as -- I -- during the investigation I -- I don't recall hearing

5   much about the immigration issue, just about the threats of --

6   sorry, I don't --

7              THE COURT:  Well, I was waiting for you to finish

8   your sentence here.

9              THE WITNESS:  Sorry.

10             THE COURT:  I'm not understanding your testimony

11  quite the same way as I understood what Ms. Sta.Ana said.

12     Were they saying that one or more of the defendants was

13  going to report them to immigration, or were they saying that

14  the Department of Labor was going to report them to

15  immigration?

16             THE WITNESS:  They stated that the Department of

17  Labor was gathering information to send to immigration.

18             THE COURT:  All right.  So none of the defendants

19  were threatening to send anything to immigration?

20             THE WITNESS:  But on another occasion they said that

21  their immigration status was -- was compromised, but they

22  didn't say how.

23             THE COURT:  Okay.  So they're not saying that any of

24  the defendants were going to compromise or do anything to

25  compromise their immigration status.  They were saying that

1  they thought the Department of Labor was going to do that?

2          THE WITNESS:  Yes, that the Department of Labor was

3  going to forward information to immigration.

4          THE COURT:  Okay.

5          THE WITNESS:  And to not speak to us, the Department

6  of Labor.

7          THE COURT:  Well, okay.  I understand that.  That's

8  something different than what I understood Ms. Sta.Ana was

9  suggesting.

10          MR. PARKER:  Correct.  I think the fourth time the

11  testimony has changed.

12          THE COURT:  Well, she's pretty clear right now.

13          MR. PARKER:  Yeah.

14          THE COURT:  I don't know that the testimony changed.

15  I don't know that she ever said that the defendants were going

16  to compromise the immigration status.  I think this witness has

17  been consistent.  It's not quite what I was told by the

18  government before the witness took the stand, though.

19          MR. PARKER:  I would agree with you.

20          THE COURT:  All right.

21  Q.  BY MR. PARKER:  Ms. Alfaro, the statements that you feel

22  are threatening based on immigration status all occurred after

23  the complaint was filed, right?

24  A.  Correct.

25  Q.  The threatening comments about people's jobs, everybody

1   eats and lives for this job and we all need to support Eduardo.

2   That happened after the complaint got filed, right?

3   A.   After the complaint, but Eduardo also made comments during

4   the investigation to the employees stating that -- that they

5   owed him by lying to the Department of Labor because he gave

6   them employment.

7   Q.   You didn't follow up with any of these employees and test

8   these statements they made, did you?

9   A.   What do you mean "test them"?

10  Q.   You didn't ask them if anybody has been fired, right?

11  A.   I have not.

12  Q.   You didn't ask if anyone has been reported, right?

13  A.   I have not.

14  Q.   You didn't ask them if they lost hours, right?

15  A.   Well, they did say that they are all shorted hours due to

16  the change of paying practice, because apparently since the

17  complaint -- it wasn't until the complaint that Eduardo did

18  change his scheduling and pay practices.

19  Q.   What I'm asking you is you didn't ask them, "Did you get

20  your hours reduced because you participated in the DOL

21  investigation," right?

22      You didn't ask that?

23  A.   Specific -- specifically, no.

24  Q.   Why didn't you ask any of that if you're trying to

25  investigate and understand whether retaliation or interference

1   with the FLSA has occurred?

2   A.  I don't know.

3   Q.  The Department filed a Rule 11 pleading in May, and all of

4   these statements you're attributing to them happened after that

5   complaint is filed.

6      What statements do you feel were retaliatory before the

7   Rule 11 pleading was filed?

8          MS. STA.ANA:  I would just like to clarify.  The

9   investigator might not understand what Rule 11 is.

10         THE COURT:  He's talking about the complaint.

11         THE WITNESS:  Well, the fact that the -- the priest

12  coming in to -- to hold confessions for the employees at the

13  restaurant, that was an act of intimidation, I believe.

14         THE COURT:  Did you look into that to see whether

15  there was any truth to that?

16         THE WITNESS:  It was multiple employees that told me

17  this, and I did try to locate the priest, but I could not.  And

18  I was told that it's a friend of the employer's.

19         THE COURT:  There was really a priest or not?

20         THE WITNESS:  I don't know if he's really a priest.

21  But the employees -- all the employees that told me this, they

22  said that they are practicing Catholics, and they have never

23  experienced a confession like that one.  They thought it was

24  very strange.

25  Q.  BY MR. PARKER:  Well, I'm glad you brought that up because

1  earlier I heard you say you reviewed for at least an hour or

2  more your declaration?

3  A.  Uh-huh.

4  Q.  Right?

5  A.  Correct.

6  Q.  With access to your notes, correct?

7  A.  Correct.

8  Q.  And with the intention of providing the Court everything it

9  needed to know in order to consider the temporary restraining

10  order based on allegations of intimidation or retaliation.

11  That's correct, right?

12  A.  Correct.

13  Q.  And your declaration doesn't say anything about a priest,

14  correct?

15  A.  Correct.

16      THE COURT:  Why not?  Sounds to me like it is pretty

17  important from what you just said here today.  As a matter of

18  fact, it's something you regard as one of the most important

19  things that necessitated this hearing, right?

20      THE WITNESS:  Correct.

21      THE COURT:  So why not?

22      THE WITNESS:  I am not sure why I didn't add it into

23  the declaration.

24  Q.  BY MR. PARKER:  Ms. Alfaro, the priest, do I now hove all

25  of the instances before the complaint was filed by the

1   government, all of the instances that you felt were or you

2   heard about that you think were retaliatory or interfering?

3   A.  Well, I also know that the employees felt intimidated

4   because meetings with yourself or your counterparts were held

5   at the restaurant, and that did make the employees feel uneasy.

6   Multiple employees mentioned that to me.

7   Q.  Did you ask any employees whether they felt intimidated by

8   your interviews?

9   A.  No.

10  Q.  Okay.  So the intimidation that you think occurred was the

11  priest and interviews with attorneys that were investigating

12  the allegations by the Department; is that correct?

13  A.  Well, it is the meetings that were held at the restaurant.

14  Q.  Ma'am, I'm trying to know the universe of things before the

15  Department filed this complaint against my client.  What I've

16  heard is the priest and the meetings with the attorneys that

17  were looking into what the Department said was wrong.

18      Are there any other acts that you feel were intimidating or

19  retaliating before May of 2022 when this complaint was filed?

20  A.  Yes, Eduardo had meetings with employees at the restaurant

21  as well to go over what they needed -- what he wanted them to

22  tell the Department of Labor, and told them that he had

23  attorneys and that the truth would come out.  And that whoever

24  was speaking to the Department of Labor needed to stop because

25  it would be found out.

1    Q.   Great.  And now do I have everything?

2    A.   I believe so.

3    Q.   Okay.  Did you ask how many meetings there were?

4    A.   There's only one that I recall.

5    Q.   One meeting --

6    A.   Correct.

7    Q.   -- that was reported to you?

8    A.   Correct.

9    Q.   And how many people attended it?

10   A.   It was, I believe, four or five employees.

11   Q.   Okay.  There's more than four or five employees at the Howe

12   location, correct?

13   A.   Correct.  But that's the only one that I was informed of.

14   Q.   Right.  You know of one meeting with four or five people

15   and apparently a bunch of employees that didn't attend, right?

16   A.   Correct.  It happened -- correct.

17   Q.   And did -- how many of the witnesses told you about this

18   meeting?

19   A.   More than three.

20   Q.   Okay.  You didn't talk to all of them that attended?  All

21   of the people that attended, right?

22   A.   No.

23   Q.   And as an investigator, that's what you would want to do,

24   right?

25   A.   Correct.

1   Q.  So you could get everybody's perspective, correct?

2   A.  Correct.

3   Q.  You didn't ask my client what was said about the meeting,

4   right?  What was said at the meeting?

5   A.  Correct.

6   Q.  You didn't look to get their perspective and see if it was

7   different than the recollection of anybody else, correct?

8          THE COURT:  You shouldn't talk to other people's

9   clients about their presence.

10          MR. PARKER:  Your Honor, this is before we ever came

11   on the scene.

12          THE COURT:  I thought you said it was after the

13   complaint was filed.

14          MR. PARKER:  No, this is all before.  I'm looking at

15   the justification the government has to file this pleading, and

16   it seems awfully thin.

17          THE COURT:  I thought you were talking now about

18   after the complaint was filed.

19   Q.  BY MR. PARKER:  Do you remember when this meeting occurred?

20   A.  It was around the beginning of the investigation.

21   Q.  Sometime in May of 2022 or '21?

22   A.  Possibly May.

23          THE COURT:  Wait, I thought the business about the

24   priest was recent.  Now are we talking about two different

25   things?  When we talk about a meeting, are you talking about

1  the meeting where they told you that the priest came around and

2  took confessions and they thought it was highly unusual?

3           THE WITNESS:  So -- he's asking me about the meeting

4  with the employer and the employees.  But the meeting with the

5  priest occurred -- I don't recall when, but it was after my

6  final conference, and my final conference was in November of

7  2021.

8           THE COURT:  I know it occurred after November 2021.

9  I thought earlier you said that this information that you heard

10  about the priest came very recently.  As a matter of fact, I

11  was thinking that it was being offered by the Secretary to show

12  why they didn't come in earlier to ask for the temporary

13  restraining order.

14     So in my -- in my understanding, that whole information --

15  set of information -- set of facts that you got about the

16  priest was something you learned very recently.

17     Was I wrong?

18           THE WITNESS:  No.  The priest occurred a couple

19  months ago.

20           THE COURT:  Okay.  Then what are you talking about

21  now?  You're talking about a different conversation?

22           THE WITNESS:  He's asking me about the employer

23  having a meeting with the employees during the investigation.

24           THE COURT:  All right.

25  Q.  BY MR. PARKER:  The meeting -- no one has ever come to you

1   after May of 2021 and said the owner had another meeting where

2   he said, "Don't cooperate with the government," right?

3   A.   No.  It was not Eduardo.  Alejandro started telling the

4   employees that.

5   Q.   Ma'am, you told me there was one meeting just less than

6   five minutes ago.

7   A.   Correct.

8   Q.   Are you changing that testimony?

9   A.   No.  I'm saying --

10  Q.   Okay.  So no one ever came to you after May of 2021 and

11  said there was another meeting where they were told not to

12  cooperate, right?

13  A.   I'm saying -- Eduardo did not have a conversation with

14  anybody regarding that after that.

15  Q.   Ma'am, why can't you answer my question?

16  A.   I am.

17          MS. STA.ANA:  Objection.  You're misstating

18  testimony.

19  Q.   BY MR. PARKER:  You said there was one meeting where

20  employees were told -- four or five employees were told don't

21  cooperate; is that correct?

22  A.   Correct.

23  Q.   And that's the only meeting you ever heard about where

24  there was a meeting with four or five employees or multiple

25  employees about that, right?

1    A.   No.

2    Q.   There were multiple.  When was the next one?

3    A.   Most recently in June, I believe, with Alejandro telling

4    the employees not to talk to the Department of Labor, not to

5    talk to the news, and that the investigation was over, and that

6    Eduardo's attorneys were handling it.  And that any information

7    that the Department of Labor is trying to gather is for

8    immigration.

9    Q.   Okay.  So no other meetings before the complaint was filed?

10   A.   Not that I can recall.

11   Q.   Right.  And the statement about your investigation being

12   over as of June of 2021, that's an accurate statement, right?

13   A.   My portion of the investigation is over, correct.

14   Q.   The Department's investigation is over.  It's now in

15   litigation, right?

16   A.   Correct.

17   Q.   So saying that the investigation is over is factually

18   correct information, right?

19   A.   Correct.

20   Q.   Now, the priest information that you received, you received

21   that in November of 2021, right?

22   A.   No, I don't recall what month I -- I said it was after

23   November.

24   Q.   Okay.  You don't recall the month?

25   A.   No, I don't.

1      THE COURT:  Just -- you know, didn't you just tell me

2  a minute ago that it was in the last couple of months?

3      THE WITNESS:  It was this year, but I don't know what

4  month it was.

5      THE COURT:  Hold on a second.

6    "A couple months ago."  You just said that.

7      THE WITNESS:  Okay.  A couple months -- well, it was

8  this year, but it was --

9      THE COURT:  I know.  This is July.

10    Okay, go ahead.

11  Q.  BY MR. PARKER:  You were told about it a couple months ago,

12  right?

13  A.  Correct.

14  Q.  They didn't tell you when the actual meeting took place,

15  right?

16  A.  I possibly have it in my notes.

17  Q.  And despite the allegation there was a priest and everybody

18  felt it was weird and intimidating, the Department didn't go in

19  for a temporary restraining order at that point, right?

20  A.  Because the --

21  Q.  Is that correct?

22      MS. STA.ANA:  Calls for a legal conclusion.

23      THE WITNESS:  Correct.

24  Q.  BY MR. PARKER:  How many employees had to talk with the

25  priest?

1   A.   I don't know how many spoke with him, but I know of three

2   or four, I believe.

3   Q.   Three or four that did speak to the priest?

4   A.   Correct.

5   Q.   Okay, great.  Did you ask for the priest's name?

6   A.   They did not know his name.

7   Q.   Did you ask for a description of him then, as the

8   investigator?

9   A.   Description, no.  I asked for a name or what parish he was

10  from.  Follow-up information/description, no, I did not.

11  Q.   Did you ask what he was wearing?

12  A.   No, I did not.

13  Q.   You didn't ask if he was dressed like a priest?

14           MS. STA.ANA:  Relevance, your Honor.

15           THE COURT:  I think before we're finished with the

16  preliminary injunction, I'd like to learn more about the

17  priest.  So bear that in mind on both sides.  And the reason

18  I'm asking the questions about it is it has to do with, A,

19  whether this was intimidation, in other words, did they bring

20  in someone who was not a priest and hold him out to be a

21  priest, or did they bring in a priest and instruct him to ask

22  questions that would be either intimidating or otherwise

23  outside the scope of his ordinary role.

24      And then, B, it might explain why the government is

25  concerned now about future intimidation.  So I think that's

1    something I'd like to learn more about.

2            MR. PARKER:  Or, your Honor, where this witness has

3    signed a declaration that mentions no priest --

4            THE COURT:  Right.

5            MR. PARKER:  -- yet went ahead and tried to go ahead

6    and give you everything to make your decision based on the

7    priest was left out.  It may not have occurred.

8            MS. STA.ANA:  Your Honor, this was an urgent brief,

9    and we concentrated on the most recent events.

10           THE COURT:  Yeah, I know you concentrated on the most

11   recent events.  And one of the most recent events was the

12   priest.

13           MR. PARKER:  And, your Honor, that's testimony from

14   counsel.  The witness has said she's added everything she felt

15   you needed to make this decision based on it.

16           THE COURT:  I understand all of that.  I've been here

17   for the last hour.

18      But that's my point.  I want to learn more about the

19   priest.  You make a note of it, okay, that's the next time we

20   come back for the hearing on the preliminary injunction.

21           MS. STA.ANA:  Will do.

22   Q.  BY MR. PARKER:  The first employee that told you they spoke

23   with the priest, what did they say they told the priest?

24   A.  They said that they started off the confession normally

25   with a prayer, and that the priest asked them if they -- how

1  long -- how long did they work for Eduardo and if they've ever

2  stolen from Eduardo.  I'm trying to remember specifics.  I

3  can't remember specifics right now, but I do know that it

4  was -- it had to do with their -- with that employee's loyalty

5  to Eduardo and to the restaurant.

6  Q.  Ma'am, despite straying from my question about what the

7  employee said, you told me everything you can recall the priest

8  saying, how long they worked for Eduardo and have you ever

9  stolen anything, correct?

10  A.  Correct.

11  Q.  You don't remember any other specific statements by the

12  priest, right?

13  A.  No.

14  Q.  And what were the employees' responses to those questions?

15  What was the first employee you spoke to about it, what was

16  their response?

17  A.  The employee -- I don't remember right now.

18  Q.  Did they say anything else to you about that confession,

19  the first employee?

20  A.  I would have to look on my notes.

21  Q.  You don't recall any other?

22  A.  No, I just generally remember the conversation generally.

23  Q.  Right.  Generally, you've told me everything you can recall

24  about what the employee told you, the first employee you spoke

25  to about the priest situation?

1    A.  Correct.

2    Q.  You told me everything, right?

3    A.  Correct.

4    Q.  And so they didn't tell you they felt it was intimidation

5    or that they felt fearful, right?

6    A.  They did -- she --

7    Q.  Ma'am, I just asked you have you told me everything, and

8    you said you did, but you hadn't said that.

9    A.  Regarding the conversation with the priest, but the

10   conversation with me, yes, the employee did tell me that they

11   found it strange.  They did tell me that they never had a

12   confession like that prior to this, and that they did feel that

13   Eduardo brought the priest to intimidate them.

14   Q.  Well, despite your offering of that, I had asked you did

15   they -- what else -- did you now tell us everything that they

16   told you about that first instance they talked with the priest,

17   and you didn't say that in the first instance, did you?

18   A.  No.

19   Q.  And so the answer to my specific question, the employee --

20   first employee you spoke to -- never said they felt intimidated

21   by the meeting with the priest, right?

22            MS. STA.ANA:  Asked and answered.

23            THE COURT:  Overruled.

24            THE WITNESS:  Can you repeat the question, please.

25   Q.  BY MR. PARKER:  The first employee never said to you that

1   they felt intimidated by having to talk with the priest, right?

2   A.  They felt that it was intimidating.

3   Q.  The employee never said they felt fearful, correct?

4   A.  Regarding that instance, no.

5   Q.  Did the employee say that talking with the priest was

6   voluntary?

7   A.  Yes.

8   Q.  So someone volunteered to go speak with the priest?

9   A.  Correct.

10  Q.  This person?

11      How long before you spoke with the second person that spoke

12  with the priest?

13  A.  I do not remember.

14  Q.  What did that person say to the priest?

15  A.  I do not remember what was said to the priest, but what I

16  do remember is that the questions were similar to what the

17  previous employee told me.

18  Q.  How long have you worked and did you steal anything, right?

19  A.  And also if the employee ever drank excessively or if the

20  employee ever drank and drove drunk.

21  Q.  Okay.  Well, those are new, right?

22  A.  Correct.

23  Q.  Unrelated to the Department of Labor's investigation,

24  right?

25  A.  Correct.

1    Q.   Stealing from the employer, that's unrelated to the

2    investigation, right?

3    A.   Correct.

4    Q.   So the statements to the priest that you can recall -- or

5    the statements from the priest, the questions were unrelated to

6    the Department of Labor, correct?

7    A.   Those statements, yes.

8    Q.   All the statements you can recall from the first two

9    because you've told me all of them, right?

10   A.   That I can recall, yes.

11   Q.   How long before the third person that you spoke to about

12   the priest situation?

13   A.   I don't know.

14   Q.   Do you remember anything different about the questions the

15   priest asked the third person?

16   A.   Not at this time.

17   Q.   Okay.  So, again, nothing related to the Department of

18   Labor, correct?

19   A.   That I can recall at this time.

20   Q.   Okay.  At the time of your testimony, you can't recall any

21   other statements?

22   A.   I don't have my notes with me.

23   Q.   Right, you didn't bring your notes.  And you didn't include

24   any of this in your declaration when you had access to the

25   documents?

1              MS. STA.ANA:  Argument.

2              THE COURT:  Overruled.

3    Q.  BY MR. PARKER:  The fourth person that you spoke to, the

4    questions by the priest were the same, right?

5    A.  I believe so.

6    Q.  And those are the -- that is all of the conversations you

7    had with any employees about the priest, right?

8    A.  That's all that I can recall at this moment.

9    Q.  And so all of the statements that you recall under oath

10   that the priest made to employees were not about the Department

11   of Labor, correct?

12   A.  The Department of Labor was not mentioned in the

13   confessions directly from what I recall, but they were

14   regarding their loyalty to Eduardo as an employer.

15   Q.  Well, you didn't say anything about the word "loyalty"

16   being used.  You had told me about the questions drinking,

17   stealing, and how long you've been here.

18              MS. STA.ANA:  Misstates testimony.

19   Q.  BY MR. PARKER:  But Ms. Alfaro --

20              THE COURT:  I don't remember her saying anything

21   about loyalty other than those examples.  Were there any other

22   things they said about loyalty to Eduardo?

23              THE WITNESS:  I did mention loyally previously in

24   my --

25              THE COURT:  I know -- well, you just mentioned the

THRESHA SPENCER, OFFICIAL COURT REPORTER, USDC

1   conclusion loyalty.  Were there any questions they said the

2   priest asked that related to loyalty to Eduardo?

3           THE WITNESS:  I don't remember specific questions.  I

4   need to look at my notes.

5   Q.  BY MR. PARKER:  Ms. Alfaro, loyalty is your conclusion

6   about what the meeting was about, right?

7           MS. STA.ANA:  Argumentative.

8           THE COURT:  I would just try to find out if she

9   said -- if she said they made any statements about what the

10  priest said concerning loyalty, and I'm hearing she can't

11  recall any.

12  Q.  BY MR. PARKER:  How long have you been an investigator for

13  the Department?

14  A.  About 12 years.

15  Q.  You've heard before that employers might investigate

16  employee theft, right?

17  A.  Okay.

18  Q.  You've heard and been involved in conversations with people

19  where that's been the subject of statements of employees have

20  made?

21  A.  Correct.

22  Q.  So it is not uncommon for you to hear that maybe an

23  employer was asking questions about employee theft, correct?

24  A.  I've just never heard of an employer bringing a priest to

25  their establishment.

1   Q.  A reported priest, right, that you didn't even ask what the

2   person looked like or what they were wearing?

3          THE COURT:  That's argumentative.

4   Q.  BY MR. PARKER:  Ms. Alfaro, just to be clear, there were no

5   statements or questions from the priest where the word

6   "loyalty" was used that were reported to you, right?

7   A.  I need to check my notes.

8   Q.  There's nothing you can recall here testifying under oath,

9   right?

10  A.  Correct.

11         THE COURT:  How much more do you have with this

12  witness?

13         MR. PARKER:  Your Honor, I don't have much more.

14  Q.  BY MR. PARKER:  The employees prior to the complaint being

15  filed also said that an attorney showed up and had a meeting

16  with the owners; is that right?

17  A.  Multiple meetings.

18  Q.  Okay.  And did they report that they were talked to?

19  A.  No.

20  Q.  Did they report that their managers pointed the attorneys

21  out?

22  A.  No.

23  Q.  All they reported to you is there's a meeting with

24  attorneys and the owners; is that right?

25  A.  Correct.

1   Q.  Did they say anything about -- anything else about those

2   meetings?

3   A.  No.

4   Q.  When were the meetings reported to you?

5   A.  I don't remember the date right now.

6   Q.  So no employee reported to you they felt

7   fearful/intimidated as a result of meetings with owners and

8   attorneys?

9   A.  Employees stated that they felt their meetings were held at

10  the restaurant as a form of intimidation.

11  Q.  What question did you ask about the meetings?

12  A.  I asked if they were spoken to, and they said no.  I mean,

13  there wasn't much for me to ask because they weren't spoken to

14  so I didn't -- I didn't explore it further.

15  Q.  My point, Ms. Alfaro, is you asked did they feel

16  intimidated, right?

17            MS. STA.ANA:  Misstates testimony.

18            THE COURT:  They called me to tell me they felt

19  intimidated.

20  Q.  BY MR. PARKER:  They said that?

21  A.  Correct.

22  Q.  How many of them were there?

23  A.  I believe three that I can recall right now.

24  Q.  When was the first report of these meetings?

25  A.  I don't know the dates.

1   Q.  Did they identify when the meeting occurred?

2   A.  It was during their shift, but I don't -- I don't remember

3   the date.

4   Q.  Did you pull any time records or request any time records

5   to verify they were working during this supposed meeting they

6   observed?

7   A.  I did not.

8   Q.  You could have, right?

9   A.  I guess, yes, I could have.

10  Q.  And you didn't ask my client about the meeting and whether

11  it was to intimidate anybody, right?

12  A.  Correct.

13  Q.  You just took the employee at their word, right?

14  A.  Correct.

15  Q.  How long until the second employee you spoke to about those

16  meetings?

17  A.  I don't recall the exact date.

18  Q.  How long after the first one was it?

19  A.  I don't -- I don't know.  I just know that I spoke to

20  multiple employees probably within the same week, whenever that

21  date occurred.

22          THE COURT:  So multiple employees called you each

23  individually to tell you they had been present when the

24  defendants conferred with their attorneys?

25          THE WITNESS:  Yes.

1              THE COURT:  All right.

2  Q.  BY MR. PARKER:  And none of these employees said they could

3  hear what was discussed, right?

4  A.  Correct.

5  Q.  If you took the employees at their word that this was

6  active intimidation, why didn't you further investigate that?

7  A.  I forwarded the information to our solicitor's office when

8  the employees contacted me.  That's -- that's what I did.  My

9  portion of the investigation was over and this happened --

10  well, actually, that -- because there's multiple times that

11  they mentioned that these meetings occurred at the

12  establishment.

13              THE COURT:  More than one meeting?

14              THE WITNESS:  Yes.

15              THE COURT:  All right.  We spent a lot of time on

16  this.

17              MR. PARKER:  I have a couple --

18              THE COURT:  I just have to comment.  You initiate a

19  lawsuit against somebody, and then you're intimidated because

20  they're consulting an attorney about the lawsuit that you

21  initiated against them.  That's where we are.

22      I'm not really that concerned about that.  I don't think

23  there's anything wrong, and I'll go on record as saying that.

24  Nothing wrong with consulting an attorney at your place of

25  business when your employees have caused you to be sued by the

1   United States government, nothing wrong period.

2      Let's go on to the next issue.  What I'm trying to decide

3   right now is whether to take a break for noon and wrap this up

4   after noon or to see if we can wrap it up before we break.

5            MR. PARKER:  Your Honor, I only have a couple more

6   questions.

7            THE COURT:  All right.

8   Q.  BY MR. PARKER:  Ms. Alfaro, as an investigator for the

9   Department of Labor, you investigate retaliation claims or

10  complaints about intimidation under the FLSA, right?

11  A.  Correct.

12  Q.  Employees have the right to make those complaints, right?

13  A.  Correct.

14  Q.  They can make them online, correct?

15  A.  I'm not sure if they're able to make them online.  I know

16  that they're able to call and make complaints.

17  Q.  Okay.  They can make them to you, right?

18  A.  Correct.

19  Q.  Okay.  You closed your investigation about the wage and

20  hour matters in November of 2021, correct?

21  A.  Correct.

22  Q.  No determination about intimidation at that point, correct?

23  A.  Correct.

24  Q.  As an employee of the United States Department of Labor,

25  are you telling me that employees made complaints to you in

1   2022 about acts of intimidation and you did not initiate an

2   investigation about it?

3   A.   I forwarded all information to -- to our solicitor's office

4   and to -- and my manager was aware as well.

5   Q.   That's not my question, ma'am.

6   A.   I personally did not initiate a retaliation investigation.

7   I forwarded the information to who I was supposed to forward

8   the information to.

9   Q.   And you are trained by the Department of Labor that any

10   time an employee makes a complaint to you, you are supposed to

11   initiate an investigation, right?

12        MS. STA.ANA:  Objection, your Honor.  This was

13   already under litigation at that point.

14        THE COURT:  That's true.

15        MR. PARKER:  Your Honor --

16        THE COURT:  And I've already said -- I'll go on

17   record and I'll make this determination right now.  It is not

18   an act of intimidation to consult with an attorney at your

19   place of business after your employees have initiated a suit by

20   the United States government against you.

21     So that's not intimidation --

22        MR. PARKER:  Yep.

23        THE COURT:  -- and she doesn't have to report it to

24   anybody because it's not intimidation.

25        MR. PARKER:  Well, your Honor, I agree with you

1    wholeheartedly.

2              THE COURT:  All right.  Then we don't have to discuss

3    it any further.

4              MR. PARKER:  But, your Honor, this goes to the

5    reliability of the witness, and she has testified she felt it

6    was an act of intimidation in addition to the priest.

7              THE COURT:  Yes, but the other thing that she said

8    was the matter was in litigation.

9              MR. PARKER:  Your Honor, this is all before the

10   litigation is filed.

11             THE COURT:  No, she said it was turned over to the

12   solicitor to the Department of Labor.

13             MR. PARKER:  The original investigation was in that

14   determination about the wage and hour matter.

15             THE COURT:  But this is part of that.  This is

16   intimidation that you're talking about.

17             MR. PARKER:  Your Honor, when my client is being

18   accused of something by the Department --

19             THE COURT:  We're finished with this hearing.

20             MR. PARKER:  Yeah.

21             THE COURT:  Now, do you have any redirect?

22             MS. STA.ANA:  I do have redirect, your Honor.

23             THE COURT:  We'll take it up after lunch.  Do you

24   want to come back at 1:00 or 1:30?

25             MS. STA.ANA:  I can come back at 1:00.

1          MR. PARKER:  Your Honor, 1:00 is fine with me.

2          THE COURT:  1:00.  1:00.

3      (Recess taken, 11:43 a.m. to 1:01 p.m.)

4          THE CLERK:  Please remain seated.  Come to order,

5  this court is now in session.

6          THE COURT:  You don't both have to be at the podiums.

7  When the other one is questioning the witness that's taking

8  some time, you can be seated at your table.

9          MS. STA.ANA:  Thanks for saying that, your Honor.

10          THE COURT:  All right.  Ms. Sta.Ana, you may proceed

11  with the redirect.

12                      REDIRECT EXAMINATION

13  Q.  BY MS. STA.ANA:  Just to make the timeline clearer here.

14  You mentioned something called an initial conference.  As an

15  investigator, what is an initial conference?

16  A.  The initial conference is the first meeting with the

17  employer where we ask specific information regarding the

18  business, pay practices, information regarding the

19  investigation.

20  Q.  And when did that happen?

21  A.  In May 2021.

22  Q.  So you testified that you spoke to workers.  When did that

23  happen in relation to that initial conference?

24  A.  I spoke to the employees following the initial

25  conference -- following receiving the records from the

1   employer.

2   Q.  And you spoke to the workers at that time period about

3   hours and pay; is that right?

4   A.  Correct.

5   Q.  What did the workers say, if anything, about interference

6   of an investigation?

7   A.  Employees told me Eduardo had given them blank time cards

8   to fill out because those are the time cards that he was going

9   to produce for me.  They took -- there were so many time cards

10  that they had to take them home and fill out the time stating

11  that they only worked 40 hours a week.

12  Q.  How many workers told you that?

13  A.  More than four employees.

14  Q.  You mentioned something called a final conference as well.

15  What is a final conference?

16  A.  A final conference is when we present the findings to the

17  employer.

18  Q.  And when did that occur?

19  A.  That occurred in November of 2021.

20  Q.  After that final conference occurred, did you talk to

21  workers after or before in relation to the final conference?

22  A.  I did speak with workers before and after the final

23  conference.

24  Q.  So I want to just concentrate on the -- close to the final

25  conference.  Did you speak to any workers -- let me rephrase

1    it -- after the final conference?

2    A.   I did speak with employees after the final conference.

3    Q.   How close to that final conference?

4              MR. PARKER:   Been asked and answered.

5              THE COURT:   Overruled.

6              THE WITNESS:   I wouldn't -- not too long after the

7    final conference.

8    Q.   BY MS. STA.ANA:   And when was that, if you can recall?

9    A.   November 2021.

10   Q.   The incident about the priest.   In relation to the final

11   conference, when did you hear about that?

12             MR. PARKER:   Your Honor, asked and answered.

13             THE COURT:   Well, if she says anything other than the

14   last two months, I'm going to be a little disturbed about it.

15   But go ahead, have her answer the question.   Because she told

16   me twice it was within the last two months.

17             THE WITNESS:   I didn't say it was the last two

18   months.   I know that it was after the final conference in

19   November 2021, and it was a couple months back, so between

20   November 2021 and a couple months back.   I don't remember the

21   exact date that they told me about that.

22   Q.   BY MS. STA.ANA:   I'm just trying to clarify timeline here.

23        So as you know the complaint was filed in May 2022.   Did

24   workers contact you the very next day the complaint was filed?

25   A.   I was contacted after the complaint was on the news.

1   Q.  And when was that, can you recall?

2   A.  I believe it was the day after the complaint was filed.

3   Q.  When -- at that time did a worker who was fired ever

4   contact you?

5   A.  After the complaint was filed, yes.

6   Q.  What did they say to you?

7            MR. PARKER:  Your Honor, this is beyond the scope of

8   the direct.

9            THE COURT:  Well, it seems to be the same thing we've

10  heard before on cross-examination.  I had not heard about it

11  being in the news on either direct or cross-examination, but we

12  went through all the different communications she had with

13  different anonymous employees.  Is this something different?

14           MS. STA.ANA:  Counsel mentioned firings during his

15  cross, and I want to ask Ms. Alfaro here about information that

16  she knows about it.

17           THE COURT:  What did he ask about firing on cross?

18           MS. STA.ANA:  He made assumptions that no one was

19  ever fired.

20           THE COURT:  He didn't ask her about that.  Did you

21  ask her about that?

22           MR. PARKER:  Your Honor, for the record I asked her

23  is she aware of any of the people that she spoke to --

24           THE COURT:  Oh, okay.

25           MR. PARKER:  -- that she thinks are fearful were

1    fired --

2              THE COURT:  All right.

3              MR. PARKER:  -- and her answer was no.

4              THE COURT:  So let's find out.  The objection is

5    overruled.

6    Q.  BY MS. STA.ANA:  So I'm going to ask you again to clarify

7    on the record.

8        Did any employees approach you who said that they were

9    fired?

10   A.  Yes.

11   Q.  And what was shared with you?

12   A.  The employee informed me that she was fired via text by

13   Alejandro, I believe, in February.

14             THE COURT:  February of what year?

15             THE WITNESS:  2022.

16             THE COURT:  Well, now we ought to be able to identify

17   this employee if she's saying she was fired by Alejandro.  She

18   can be identified.

19             MS. STA.ANA:  So, you know, in reflecting on what was

20   said today, you know, we're not going to try to hide anybody.

21   But the ask here is for a TRO so employees feel safe to testify

22   and to be witnesses.

23             THE COURT:  Listen, don't jerk me around.  You're

24   saying -- you still should protect the identity of this --

25             MS. STA.ANA:  I didn't say that.

1           THE COURT:  Okay.  Tell me the name of this employee.

2           THE WITNESS:  Maria Parra.

3           THE COURT:  Maria what?

4           THE WITNESS:  Parra, P-A-R-R-A.

5           THE COURT:  All right.  Thank you.

6    Q.  BY MS. STA.ANA:  Okay.  She told you in February that she

7    was fired in February 2020.  What did Ms. Parra -- why did

8    Ms. Parra think she was fired?  Did she say that to you?

9    A.  She believed that Eduardo and Alejandro thought that she

10   was the one giving information to the Department of Labor

11   regarding the investigation.

12   Q.  Did Ms. Parra eventually come back to work at Che

13   Garibaldi?

14   A.  Yes.

15   Q.  When did she come back?

16   A.  April 2022 Eduardo told her that he was short-staffed and

17   needed help.  So she went back to work, I think, a couple days.

18   Q.  A couple days.  What does that mean?

19   A.  I believe it was on the weekends because she had another

20   job.

21   Q.  Did she still work at Che Garibaldi?

22   A.  No.

23   Q.  How did her employment end at Che Garibaldi the second

24   time?

25   A.  Following the complaint filed in May 2022, Eduardo called

1    Maria and told her that they no longer needed her.

2              THE COURT:  So they fired her again in May?

3              THE WITNESS:  Yes.

4              THE COURT:  Eduardo did?

5              THE WITNESS:  Yes.

6    Q.  BY MS. STA.ANA:  So you then heard from an employee again

7    in mid-June, correct?

8              MR. PARKER:  Your Honor, leading and vague.

9              THE COURT:  Yes.  Sustained.

10   Q.  BY MS. STA.ANA:  When was the last time you heard from

11   workers?

12   A.  June 2022.

13             MR. PARKER:  Asked and answered, your Honor.

14             THE COURT:  Overruled.

15             MS. STA.ANA:  And --

16             THE COURT:  I don't have a clue.  If you think it's

17   been asked and answered, I don't know what the answer is.  When

18   was the last time you heard from workers?

19             THE WITNESS:  June 2022.

20   Q.  BY MS. STA.ANA:  And you testified earlier that workers are

21   scared, and why do you think that?

22   A.  Because of the comments that Alejandro has made to the

23   employees.

24             MS. STA.ANA:  I have no further questions, your

25   Honor.

1          THE COURT:  Any re-cross on this limited subject of

2   the firing of Maria Parra?

3          MR. PARKER:  Yes, your Honor.

4                    RE-CROSS EXAMINATION

5   Q.  BY MR. PARKER:  I'd like to start with understanding when

6   in June you last heard from employees?

7   A.  I would say mid-June 2022.

8   Q.  Are you able to be any more specific than mid-June?

9   A.  I don't remember the exact date.

10  Q.  Within the last 30 days, you don't remember the exact date?

11  A.  I don't remember the exact date.

12  Q.  When Ms. Parra first came to you, it was February 2022,

13  correct, about being fired?

14  A.  Correct.

15  Q.  And she directly reported to you as an investigator with

16  the Department of Labor that she believed she was fired because

17  she talked with the Department of Labor?

18  A.  That was her understanding.

19  Q.  And under your regulations you're supposed to open up an

20  investigation when that occurs, right?

21          MS. STA.ANA:  Objection, your Honor.  The litigation

22  was already in progress during that conversation.

23          THE COURT:  Overruled.

24          THE WITNESS:  I forwarded the information to the

25  solicitor's office and to a manager.

1  Q.  BY MR. PARKER:  I didn't ask you what you did.  I asked you

2  under the regulations when someone reports that to you and a

3  federal complaint has not been filed yet, you are supposed to

4  open up an investigation, right?

5  A.  The Department of Labor is supposed to open an

6  investigation if -- well, there's a procedure to opening

7  investigations.

8  Q.  Right.  And you, as the person that it was reported to,

9  were supposed to do that, right?

10  A.  No.  I can take a complaint, but I cannot open an

11  investigation.

12  Q.  Okay.  You submitted to someone that is supposed to start

13  an investigation?

14  A.  I forwarded the information.

15  Q.  And is that what the procedure is, to initiate an

16  investigation once you've taken the complaint?

17  A.  There's different steps to initiate an investigation, and

18  to be honest it's not my scope of employment so I don't know

19  what the exact process is.  I know what I'm supposed to do.

20  Q.  You're supposed to take in the information, and then you're

21  supposed to submit it somewhere to initiate the investigation?

22  A.  I forwarded the information.

23  Q.  I know what you did.  But you're supposed to forward it to

24  someone who is going to initiate the investigation --

25  A.  Going to --

1   Q.  -- absent litigation already started, correct?

2   A.  Analyze whether it is a valid complaint or not, and then

3   take the proper steps moving forward.

4   Q.  What did you do to validate the complaint?

5   A.  I forwarded the information to who I was supposed to.

6   Q.  You just said you're supposed to evaluate it.  What did you

7   do to --

8   A.  That's not part --

9   Q.  -- validate the complaint that you received?

10  A.  That's not part of my job to validate the complaint.  I

11  forward the information or take -- or enter the complaint.  I

12  don't validate the complaints, the managers do.

13  Q.  Did you ask her if she had been told any reason for her

14  termination in February?

15  A.  She said that's what she believed it to be.

16  Q.  My question is not what she said --

17  A.  I did ask.  That was her answer.

18  Q.  -- my question is what you asked her as the investigator

19  for the Department of Labor.  Did you ask her why -- what they

20  said she was fired for?

21  A.  I did ask her.

22  Q.  What did she say?

23  A.  She said that she believed she was terminated because she

24  felt that Alejandro and Eduardo believed her to be the one

25  informing the Department of Labor.

1    Q.  So did you then ask her again, "Please answer my question

2    because you didn't"?

3        If your question is, "What did they say?"  And she said "I

4    feel this," she didn't answer your question.  So did you follow

5    up --

6    A.  She forwarded text messages.

7    Q.  Did you follow up and say, "What did they tell you the

8    reason for your termination is?"

9    A.  I did, and she forwarded the text messages to me.

10   Q.  Great.  You don't have them here today?

11   A.  No.

12   Q.  Well, what did they say?

13   A.  The text messages did not specifically say anything

14   regarding the DOL investigation.

15   Q.  Great.  That saves my follow-up question.  I asked you what

16   they did say.  They didn't say anything about the DOL

17   investigation, right?

18   A.  No.

19   Q.  And you never disclosed to my clients that Maria was

20   involved, right?

21   A.  Correct.

22   Q.  You never did anything to indicate anything about her

23   involvement, right?

24   A.  Correct.

25   Q.  You were fearful that she would be subjected to retaliation

1    if you somehow indicated that she was the person cooperating,

2    right?

3    A.  Correct.

4    Q.  And so you made sure to deprive my client of that

5    knowledge, right?

6              MS. STA.ANA:  Objection.  Argumentative.

7              THE COURT:  Sustained.

8    Q.  BY MR. PARKER:  They couldn't have fired her for

9    participating because they didn't know if she did, right?

10             MS. STA.ANA:  Objection.  Personal knowledge.

11             THE COURT:  That's a good question.  No, that's a

12   very good question.  Does she have any reason to know that the

13   defendants knew if or whether Ms. Parra was cooperating with

14   the DOL.

15             THE WITNESS:  I don't know if they did.

16   Q.  BY MR. PARKER:  You didn't ask her how or why she thought

17   that Alejandro was firing her and Eduardo was firing her

18   because she participated, right?

19   A.  Can you repeat that?

20   Q.  Yeah.  You did not ask her during this conversation about

21   the February termination, "How do you know that Alejandro and

22   Eduardo supposedly fired you for cooperating or giving

23   information to DOL"?

24   A.  I don't -- I don't have that answer.

25   Q.  You passively took in her information and restated it here

1   in court as truth, right?

2   A.   No.   I have notes from their conversations, and that's the

3   information that I recall at this moment.

4   Q.   My point is, Ms. Alfaro, since you didn't open an

5   investigation and you didn't conduct any investigation into

6   these allegations, you made no determination about whether this

7   occurred or not, did you?

8            MS. STA.ANA:   Objection.   This was during litigation.

9            THE COURT:   Well, she apparently made a determination

10  that Ms. Parra was fired, but did she make a determination that

11  Ms. Parra was fired for cooperating with the DOL or for some

12  other reason, and I think she said that Ms. Parra provided her

13  with some emails that contained the ostensible reason why she

14  was fired.   Now, it would be relevant for the Court to know

15  what those emails said about why she was fired.

16           THE WITNESS:   The text messages stated just -- it was

17  Alejandro asking her to -- to return her uniform shirt, and she

18  asked why she was being fired, and Alejandro did not give her a

19  specific reason.

20           THE COURT:   Oh, all right.

21  Q.   BY MR. PARKER:   Your declaration contains none of this

22  information about an allegation that a termination occurred as

23  a result of participation in the Department of Labor, right?

24  A.   Correct.

25  Q.   Has Maria Parra been an informant for the DOL?

1          MS. STA.ANA:  Objection, your Honor.  That falls into

2     the government informant's privilege.

3          THE COURT:  Overruled.

4          THE WITNESS:  Maria Parra is one of the employees

5     that I contacted to interview.

6     Q.  BY MR. PARKER:  Is she the person that you saw when you

7     were in the facility and then the first person you called?

8     A.  No.

9     Q.  Okay.  And I'm not going to ask at this point who that is;

10    I think I'm entitled to the information.

11         But what specifically is it that Ms. Parra reported other

12    than her termination about the alleged intimidation by my

13    client?

14         THE COURT:  Well, if this is different from the fact

15    that she was fired, I think it's already been covered both on

16    direct and cross.

17         MR. PARKER:  Your Honor, I would submit that since I

18    did not have the knowledge of who made various statements, I

19    don't know which statements are attributable to this employee,

20    and they may suffer from a lot of credibility if there are

21    legitimate reasons for her termination.

22         THE COURT:  They may be, but we can't go on forever

23    here.  I guess you, since I've gone this far, you can finish up

24    on this subject.

25         MS. STA.ANA:  I'm just going to say, you know,

1    objection given the fact that, like, information that she did

2    receive -- or that Ms. Alfaro did receive from Ms. Parra

3    leading up to the complaint is still protected by informants

4    privilege.

5              THE COURT:  Well, so this so-called informants

6    privilege is going to be the subject of some further discussion

7    when we get to the preliminary injunction.  But if it is

8    anything like *Roviaro*, which I do understand and I am very

9    familiar with, her identity is already here; we already know

10   who she is.

11             MS. STA.ANA:  With information that she has known.

12             THE COURT:  Overruled.

13   Once we know who she is, there's no reason why we can't go

14   into further details of what she said since we have already

15   talked at some length about everything else she said.

16   Go ahead.

17             THE WITNESS:  Can you repeat the --

18             THE COURT:  I'm not sure how much it is going to help

19   me with this motion.  But you can't just arbitrarily say, "Oh,

20   because we call it the informants privilege it is beyond

21   reach."

22   No, you've already talked about her, you've already had

23   testimony about what she told this witness, and this is just

24   some more information that she may or may not have given this

25   witness.

1      So go ahead.

2   Q.  BY MR. PARKER:  What was it that Ms. Parra reported other

3   than the termination regarding alleged intimidation by my

4   clients?

5   A.  Maria was one of the employees that took part with the

6   confession with the priest.  Maria also alleged the issue with

7   immigration and Alejandro threatening employees about

8   immigration.

9      She also said that -- she also said that a lot of people at

10  the restaurant were fearful for the immigration status because

11  Eduardo is the one who brought them from Mexico illegally.

12     She said that she was scared to share this information with

13  me because she didn't want it to get back to Alejandro -- I

14  mean, Eduardo that she was telling us this information.  And

15  she was a shift manager and had a lot of information regarding

16  the scheduling and the payments, and she did tell us about

17  Eduardo and Alejandro giving the time cards to the employees to

18  take home and redo their time cards stating that they only

19  worked the 40 hours.

20  Q.  Is there any employee that's giving you more information

21  than Ms. Parra?

22  A.  The information is similar.

23  Q.  They all had access to all of these time cards and

24  information as a shift leader?

25  A.  Well, they were sent home with time cards to redo at their

1    own homes.

2    Q.  Fair to say in her position she's been --

3    A.  In her position --

4    Q.  -- able to provide you the most information compared to the

5    other employees you've spoken with, right?

6    A.  Yes.

7    Q.  And when she recently contacted you again, did she call

8    from the same phone number?

9    A.  No.

10   Q.  Did she tell you where she's working now?

11   A.  I don't remember if she told me the place; the name where

12   she was working.

13   Q.  She provided you updated contact information for your

14   phone, right?

15   A.  Yes.

16   Q.  And do you remember any of it as you sit here today?

17   A.  Her contact information?

18   Q.  Yes.

19   A.  I have it in my notes.

20   Q.  So you don't remember any of the contact information as you

21   sit here today?

22   A.  I don't memorize her information, no.

23   Q.  Okay.  And she got re-hired by the company at some point?

24   A.  Yes.  Eduardo said he was short-staffed and needed her

25   help.

1   Q.   Okay.  And the Department of Labor matter was not over at

2   that time, right?

3   A.   That was prior to the complaint being filed.

4   Q.   Correct.  But the -- the legal proceeding, the litigation

5   was still underway at that point, correct?

6   A.   My investigation was concluded.

7   Q.   I know.  I thought I've heard you say because I pointed out

8   that you didn't begin an investigation like you're trained to

9   do when this was reported to you, you handed it over to the

10   attorneys because this was in litigation --

11         THE COURT:  All right.  This is highly repetitious.

12   How much longer do you think you're going to take?

13         MR. PARKER:  Five minutes, your Honor.

14         THE COURT:  All right.  Give you five more minutes.

15   Q.   BY MR. PARKER:  So she told you why she was re-hired in

16   April?

17   A.   Yes.

18   Q.   Okay.  And then at some point later she called you back

19   from a different contact information and told you she was let

20   go again?

21   A.   I don't recall when it was she -- she had a different phone

22   number.

23   Q.   Okay.

24   A.   But, yes, she contacted me to tell me that Eduardo told her

25   "You're no longer needed here."

1  Q.  Okay.  And so the second time no mention of the Department

2  of Labor was made when they fired her, right?

3  A.  No.

4  Q.  And no mention of the investigation by the Department of

5  Labor or the litigation was mentioned, right?

6  A.  No.

7  Q.  Did you ask her during that time, "Why do you believe that

8  you were let go because of the complaint"?

9  A.  I did.

10  Q.  Okay.  What did she say?

11  A.  She believed it was because of the news coverage and the

12  complaint that was filed.

13  Q.  Did you ask her why she felt that they targeted her

14  specifically?

15  A.  She believed that she was the informant -- that she

16  believed that Eduardo and Alejandro believed she was the person

17  that was contacting the Department of Labor and informing us

18  with information.

19  Q.  What did she say that was based on since you hadn't told

20  them?  What did she say that was based on?

21  A.  She didn't.

22          MR. PARKER:  She didn't.  That's all I have, your

23  Honor.

24          THE COURT:  All right.  Any more questions?

25          MS. STA.ANA:  No, your Honor.

1          THE COURT:  All right.  Thank you, Ms. Alfaro, you

2    may step down.

3      Now, before we terminate the hearing, I would be interested

4    to know, Mr. Parker, from you what is your understanding of

5    whether Ms. Alfaro was fired, and if so, the reasons for it.

6          MR. PARKER:  Your Honor, I do not have any

7    information to provide on that at all.

8          THE COURT:  Why not?  Why not?

9          MR. PARKER:  This wasn't even in the declaration or

10   the application.  This is brand new --

11         THE COURT:  Right.  You didn't --

12         MR. PARKER:  -- this afternoon.

13         THE COURT:  You didn't bring any representative of

14   your clients here?

15         MR. PARKER:  I did not, your Honor.

16         THE COURT:  All right.  I would have thought you

17   would.

18         MR. PARKER:  I have their -- I have their --

19         THE COURT:  That they'd be at least interested in

20   what's going on.

21         MR. PARKER:  They're very interested, your Honor.

22         THE COURT:  Well, when you're interested you might

23   want to show up.  This is a public proceeding.

24         MR. PARKER:  I understand that, your Honor.  What

25   we've done on this emergency basis, since there is a business

1   to run, is we've actually provided first party testimony about

2   this information.

3              THE COURT:  I know.  I know you have, and you don't

4   have any first party testimony on whether or why Ms. Parra was

5   fired.

6              MR. PARKER:  Your Honor, I would point out that since

7   we do know her identity, any statements that she's made are

8   absolute hearsay and not subject to the exception here.

9              THE COURT:  Well, that's not true, Mr. Parker.

10  Because the secretary is very aware of the fact and points out

11  to the Court that hearsay is admissible in a hearing on a

12  motion for a temporary restraining order.  So I can't say that

13  I will reject anything just because it's hearsay.  If I said

14  that, it would be reversed on appeal.  The only thing I can say

15  is what credence I give to any hearsay that's presented and

16  whether I find it's reliable.  That's all I can say.

17             MR. PARKER:  And --

18             THE COURT:  So right now I'm not going to reject what

19  she said about Ms. Parra, but I'm going to give it such weight

20  as I think it deserves.

21             MR. PARKER:  And, your Honor, the evidence that you

22  do have contradicts the statement that she was let go and

23  fired.  That's direct examination that is not hearsay.

24             THE COURT:  Where is the evidence that she was not

25  fired?

1          MR. PARKER:  In the declarations that my clients have

2    gone ahead and submitted.

3          THE COURT:  Which part of the declarations establish

4    that she was not fired?

5          MR. PARKER:  Paragraph six of the declaration of

6    Hector Manual Martinez Galindo states that "Since the

7    Department of Labor began its investigation in May of 2021, the

8    company has not terminated a single employee nor has the

9    company ever called immigration authorities on any of its

10   employees."

11         THE COURT:  All right.

12         MR. PARKER:  The same statement is made --

13         THE COURT:  All right.  So that's a good point.

14   Ms. Sta.Ana, do you take the position that that is a perjurious

15   declaration?

16         MS. STA.ANA:  Correct, your Honor.

17         THE COURT:  Your client is in serious trouble if it

18   turns out that Ms. Parra was terminated, right?

19         MR. PARKER:  Your Honor, based on a hearsay

20   declarant, I think that the representation or the allegation

21   that that's perjurious are outrageous.

22         THE COURT:  Well --

23         MR. PARKER:  They have no evidence to present with

24   any deal of reliability.

25         THE COURT:  Somebody has -- somebody has these texts,

1  and I would be within my authority if I just insisted that you

2  bring those texts to me and show them to me.  Now, I don't want

3  to prolong this hearing any longer, but I have a serious

4  interest in whether one side or the other has committed perjury

5  in this hearing.

6     Now, where are those texts?

7         MS. STA.ANA:  Ms. Alfaro's files, your Honor.

8         THE COURT:  Where is her file?

9         MS. STA.ANA:  They're at the Department of Labor.

10        THE COURT:  Can you access it online?

11        MS. STA.ANA:  I will have Ms. Alfaro answer that.

12        THE COURT:  Have her tell you and then you tell me.

13        MS. STA.ANA:  I think we can provide that through an

14  email.

15        THE COURT:  All right.  You get it to me.

16     Here is why I am making this inquiry.  The closest you have

17  come to establishing actual intimidation -- or much worse and

18  more relevant, actual retaliation is in this allegation that

19  Maria Parra was terminated because she cooperated with the

20  Department of Labor in this investigation.

21     Now if there's some dispute about whether that happened,

22  that is a material dispute in this hearing.  And before I rule

23  it would be nice to know who's lying and who's telling the

24  truth.

25     So how long is it going to take you to get those texts to

1   me?

2              MS. STA.ANA:  Within 15 minutes, hopefully.

3              THE COURT:  All right.  Let's take a 15-minute break,

4   and we'll see what you give me.

5              MS. STA.ANA:  Who should I email it to?

6              THE COURT:  What?

7              MS. STA.ANA:  Who should I send the email to?

8              THE COURT:  You can send it to the clerk.  Also, as

9   long as we're taking a break here, Mr. Parker, if you have any

10  more information to support the statement of your client that

11  nobody was fired.  For example, records -- the defendant ought

12  to keep records of who they fire.  They could have Ms. Parra's

13  employment records.  If you have anything tangible to present

14  to the Court on this question and you can come up with it on

15  this break, let's do that too.

16             MR. PARKER:  I will, your Honor.  Thank you.

17             THE COURT:  All right.

18        (Recess taken, 1:35 p.m. to 2:02 p.m.)

19             THE CLERK:  Please remain seated, this court is again

20  in session.

21             THE COURT:  Have both of you received the printout of

22  the texts that were provided to the Court?

23             MS. STA.ANA:  Yes, your Honor.

24             MR. PARKER:  I have, your Honor.

25             THE COURT:  I have read the English translation.  It

1   is a very bad translation.  I don't know where the translation

2   came from.  My law clerks said maybe you just went to Google

3   translate or something.  We have experience with interpreters

4   in this court that I'm sure could do a much better job, and

5   eventually when we get to the ultimate question that we have to

6   resolve, I would urge you to get the real interpreters to give

7   us the English version of what was said.

8       But here is the way I read the English translation that was

9   provided to me.  Maria sends messages to Alejandro, is that who

10  it is to?

11          MR. PARKER:  Yes, your Honor.

12          THE COURT:  All right.  Maria sends messages to

13  Alejandro, and she says she's -- she wants to warn him of

14  something, and that's the best you can tell.

15      Now, if it was a better translation we would know more

16  about it.  And they get to the point where she says, "I am only

17  warning you that you are firing me without reason.  I don't

18  have any warnings."

19      And that's the first mention of any firing.  There's no

20  mention by him and there's no mention that I can tell by her of

21  being fired.  And then she says, "Soon you'll be talking to the

22  Labor Department on my behalf.  I don't have a month of working

23  but five years."

24      So he immediately comes back and says, "No, Maria, stop

25  telling myths and talk to me."

1      So he appears to me to be denying her allegation that he

2   was firing her, that that's the way I read the first exchange

3   of texts.

4      Now, the next exchange she goes back and says, "Thank you

5   for messages accepting that you fire me without reason," but

6   yet there are no messages that say that he's either firing her

7   with or without reason that I can see.

8      So she says this.  And then she says again, "Soon you will

9   talk to the Department.  They take care of everything."  I take

10  this as a threat by her to report something to the Department

11  that he is denying having done.

12     When she says that "soon you will talk to the Department,"

13  he immediately comes back and says, "I didn't fire you," okay?

14     So there's no statement from him anywhere in this exchange

15  of email that he is firing her.  There are numerous allegations

16  that appear to me to look like she's trying to set him up for

17  something.

18     He says, "I did not fire you, but you're not going to show

19  up for work or when you're thinking of showing up."

20     Now, I think if we got the right translation of that, he's

21  asking her when she's going to show up.  And she says

22  "Thursdays, as always."

23     Now, somebody that was fired -- that really thought they

24  were fired say they're going to show up "Thursdays, as always"?

25  So that's the way I read that second exchange of texts.

1          And then the third exchange she's back again and she says,

2     "Thank you for the messages of accepting that you fired me

3     without reason."

4          Again, there are no messages saying that he fired her or

5     that he fired her without reason.  Just the contrary.  There

6     are statements by him saying he is not firing her, and she goes

7     on to say, "Soon you will talk to the Department.  They will be

8     in charge of everything."  I interpret that as I see it as a

9     threat again by her to report something to the Department that

10    he is not doing.

11         He immediately comes back again for the third time and says

12    "I did not fire you.  But if you are not presenting yourself to

13    work or when you are thinking of presenting yourself."

14         Now, it looks to me like colloquially he's saying, "I

15    didn't fire you, but when are you going to show up for work?"

16    And she says again, "Thursdays, like always."

17         I don't read that as somebody who thought they were fired.

18    I read that as somebody who was trying to set up the employer

19    for some kind of adverse action against the Labor Department.

20    That's the way I read it.  It doesn't make me feel good about

21    the plaintiff's case.

22         So that's how I resolve this.  Did you have anything to

23    add, any other information that you got ahold of in the

24    meantime here, Mr. Parker?

25                   MR. PARKER:  Your Honor, during the 15-minute break I

1  spoke with one of my clients who believes that Ms. Parra is

2  still working with them. I've asked for her the last time that

3  she's been paid through payroll, I don't have that information

4  at this point. I'd be happy to provide it, but given the texts

5  and the misrepresentation by the witness as to what they

6  represent, I don't think it's needed.

7          THE COURT: No, I don't think it's needed either. If

8  somebody has got a better translation of this, we'll eventually

9  get to it when we get to subsequent proceedings in this matter.

10     Now, is there any other testimony that either side wanted

11  to present today?

12          MS. STA.ANA: Not today, your Honor.

13          MR. PARKER: No, your Honor.

14          THE COURT: All right. Here is my thinking right

15  now. As I said, I think the closest that the secretary came to

16  demonstrating to this Court a risk or likelihood of retaliation

17  against any of the complainants or intimidation was this

18  allegation that they had fired Maria Parra, which I find to be

19  totally unsupported and incredibly controverted in the record.

20     Otherwise, I don't have to determine the likelihood of

21  success on the merits of each of the claims that the -- that

22  the plaintiff is making.

23     There may be, and I emphasize "may be," a likelihood shown

24  of success on one or more of the claims, but certainly nothing

25  that relates to harm that might occur to any of the

1    complainants during the time from today's date until the time

2    that we could hear the motion for a preliminary injunction on

3    its merits.

4         That is more or less reaffirmed by the delay that the

5    secretary has taken in order to bring this matter up for a

6    hearing on the temporary restraining order.  I mean, this thing

7    has been on file for months.  All of this information that I've

8    heard about here from the witness was available for a

9    substantial period of time before the Secretary filed this

10   motion for a temporary restraining order.

11        And I don't see anything that's likely to change the status

12   quo in any significant way that's likely to occur between now

13   and the time that we can hear the preliminary injunction.  If I

14   haven't already told you, I can hear it if you're ready to

15   brief it sometime in the week after next.

16        If you can be ready, I can be ready, and I'll hear it.  If

17   you can't hear it then, I do have that other trial, and I won't

18   be able to get to you until after August the 12th, but I can

19   hear it anytime after August the 12th if you either don't want

20   me to hear it or can't be ready for it before the 25th of July.

21            MS. STA.ANA:  Does this also include the informant's

22   privilege briefing as well?

23            THE COURT:  You can brief the informant's privilege.

24   Anything else that we've discussed now -- you know, as I told

25   you, I'm familiar with *Roviaro*, I deal with it all the time.

1   And in *Roviaro* you'll recall the Supreme Court said that the

2   privilege didn't apply because the informant was a percipient

3   witness to the crime -- was actually, as I recall, sitting in

4   the seat of the car when the deal went down.

5        And so what we usually look to when we're talking about

6   *Roviaro* is whether the informant was any kind of a percipient

7   witness to any of the events that would be relevant at the

8   trial.  And if he or she was, then we require the government to

9   disclose the identity of the informant.

10       Now, the so-called informant privilege, which I've never

11  heard it called directly as such before, doesn't apply when an

12  informant goes to the government and says "I'm the victim of

13  this crime."

14       If somebody goes to the government and says, "I was raped

15  by the defendant, I was robbed by the defendant.  The defendant

16  stole my property, the defendant sold drugs to me," et cetera,

17  we don't apply *Roviaro*.  The government cannot keep that

18  person's identity secret from the defendant in a criminal case.

19       Now, you can brief what the Ninth Circuit in its wisdom has

20  said about the so-called privilege in civil cases, but I'm

21  going to have to be persuaded if it says somebody can

22  go to the Department of Labor or to the Department of Homeland

23  Security or anybody else and claim that the defendant did

24  something to them that constituted a violation of the laws that

25  are enforced by that Department, and that Department can keep

1    that person's identity a secret from the defendant.

2        I would be surprised if it does, but I would never be

3    surprised by anything that might come out of the Ninth Circuit.

4    I've got to read it first.  But I would be surprised.  Any more

5    than the Courts would say somebody can come to -- to the law

6    enforcement agency and claim they were robbed by the defendant

7    and they don't have to tell the defendant who the alleged

8    victim is.  Let him figure it out.  We're going to go to trial.

9    We're going to charge you with robbery, but you don't get to

10   know who the person was that you supposedly robbed.

11       Now, they may say that, but you're going to have to

12   persuade me, okay?  So when you brief the informant privilege,

13   you can talk about that.

14            MS. STA.ANA:  Yes, your Honor.

15            THE COURT:  And again, the hearing on the preliminary

16   injunction is probably going to be substantially similar to

17   what we've had on the TRO because the question is almost the

18   same.  The question is can we preserve the status quo between

19   the time of the hearing on the preliminary injunction and the

20   time of the final hearing on the merits?  That may be a longer

21   period of time and so the issues may be a little different.

22       But I will accept your representation that the *Winter* test

23   does not include the requirement of showing irreparable harm

24   when, as here, there's a statute entitling the Secretary to

25   injunctive relief.

1    So that will be the issue when we get to the hearing on

2    preliminary injunction, is there a likelihood of success on the

3    merits.

4        Nevertheless, I think it's still relevant whether you call

5    it irreparable harm or whether you call it preserving the

6    status quo or whether you call it something else to look to the

7    question of whether it's necessary to enjoin something between

8    the time that we can hear the preliminary injunction on the

9    merits and the time that we can get to the -- to the final

10   hearing.

11       Okay.  Now, you understand what we're going to be doing in

12   the hearing on a preliminary injunction.  Can you do it before

13   July the 25th?

14            MS. STA.ANA:  Do you expect witnesses for the PI,

15   your Honor?

16            THE COURT:  Yes.

17            MS. STA.ANA:  If so, the later date might have to

18   work in order to talk to the witnesses -- to any potential

19   witnesses that are willing to come forward at this point.

20            THE COURT:  All right.  Is that all right with you,

21   Mr. Parker?

22            MR. PARKER:  Your Honor, I don't disagree with that.

23   Within our opposition we've requested expedited discovery.

24   That would include the investigator's file, her deposition, the

25   deposition of any witnesses that they're relying on.  I think

1   it's incumbent upon or it sounds like the Department will

2   continue to resist the identification of those people.  It

3   sounds like we'll need to brief and address the issue of the

4   so-called informant's privilege first before we can adequately

5   identify when the preliminary hearing would even happen.

6          THE COURT:  No, it's not going to have -- we'll be

7   here forever.  You want the cart before the horse or do you

8   want the horse before the cart?  We're going to address the

9   privilege at the time of the hearing on the preliminary

10  injunction, but I've already told them what the -- what the

11  probability is that they will convince me that testimony is

12  credible when you haven't had a chance to even know who your

13  accuser is.

14         MR. PARKER:  Is the Court suggesting that we'll have

15  a preliminary injunction hearing and we'll decide then and

16  there, sort of like we did today, where witnesses will take the

17  stand, my client will not have been able to adequately prepare

18  to cross-examine him?

19         THE COURT:  Right.  That's right.  That's the way it

20  goes.  That's the way it goes.  What else do you suggest?

21         MR. PARKER:  Today went very well, your Honor, with

22  the cross-examination.  I don't think I'll have any problem

23  with that.

24         THE COURT:  Yeah, that's the way it has to go.

25     The whole problem is caused by the government's reliance on

1    a doctrine that in my 32 years on this court of handling

2    literally hundreds of criminal cases and, I might add, dozens

3    and dozens of FLSA cases, I've never heard of this doctrine of

4    informant's privilege in the context of a labor case.  And

5    they're very adamant that it is just a well-established concept

6    that we use all the time.  They cited cases and so forth, and

7    they've come to me on one day's notice, and I don't want to be

8    wrong on this point.  But yet I've got to proceed with the

9    hearing on a preliminary injunction because everybody is

10   entitled to it.

11          MR. PARKER:  Your Honor, I agree with you.  I'm fine

12   with that.  The only additional ask that I would have then is

13   that in their briefing, so I can adequately prepare, that they

14   identify the witnesses they are going to call so that I can --

15   if they're going to waive the informant's privilege and present

16   an actual witness rather than just the investigator again, I

17   would like an opportunity to at least be able to prepare at

18   that point for the person.

19          THE COURT:  That makes sense.  Do you want me to set

20   a time for the briefing now then?

21          MS. STA.ANA:  Yes, your Honor.

22          THE COURT:  All right.  Give me a suggestion from the

23   government.  What's your suggestion?

24          MS. STA.ANA:  In terms of briefing, we have the date

25   of August 12th for the hearing itself.  Today is the 7th.

```
 1                THE COURT:  Well, no.  August 12th is the last day of

 2   the trial that I'm going to have.

 3                MS. STA.ANA:  Okay.

 4                THE COURT:  So you need to be sometime during the

 5   week of August the 15th.

 6                MS. STA.ANA:  The week of August 15th.  Okay.

 7   Understood.  In terms of any brief writing, we can have

 8   something to you within two weeks from today.

 9                THE COURT:  Okay.  So let me -- let's set a date now

10   for the hearing.

11        Karen, give us -- we have a law and motion on the 15th, I

12   assume.  What date in that week is best for a hearing in this

13   case?

14                THE CLERK:  Law and motion, your Honor, is the

15   following week.  So that week, the week of the 15th -- one

16   moment.

17                THE COURT:  We can do it on the 16th probably then.

18                THE CLERK:  You can probably even do it -- let me

19   look at the 15th because that is a scheduling conference day.

20   One moment, your Honor.

21                THE COURT:  It's a little early for us to say that

22   there aren't going to be any status conferences because --

23                THE CLERK:  Right.

24                THE COURT:  -- I have to review the reports first.

25                THE CLERK:  Yes, your Honor.  Okay, the 16th.  Let me
```

1  check one more place, your Honor.  The 16th is available, your

2  Honor.

3          THE COURT:  All right.

4          MR. PARKER:  Your Honor, for defendants that's

5  available.

6          THE COURT:  All right.  I left my personal calendar

7  in the chambers.

8          THE CLERK:  That's what I was looking at.  I didn't

9  see anything.

10          THE COURT:  Nothing there?  All right.  Let's do it

11  then at 9 o'clock on the 16th of August.  With that in mind,

12  when would you like to get the formal motion supported by any

13  and all documents that you want the Court to consider on file,

14  and then I'll ask Mr. Parker when he wants to get his

15  opposition on file.

16          MS. STA.ANA:  Is August 4th okay to the Court?

17          THE COURT:  Why would you want to wait that long?

18          MS. STA.ANA:  In terms of trying to get the witnesses

19  to be able to testify, I want to be able to try to have that

20  amount of time, but we can do what we originally suggested to

21  do if the Court prefers.

22          THE COURT:  I see.  So the reason she wants more time

23  than I would otherwise think is she wants to incorporate the

24  identification of the witnesses who are going to testify in her

25  motion, and she needs the time to talk to those people and

1   decide which one she's going to call.  I have a hard time

2   rejecting that suggestion.  But if you didn't have to have the

3   names of the witnesses or any description of them, then we

4   could say her motion would be on file earlier, and then the

5   witnesses would not have to be identified until August the 4th.

6   Which would be your preference here, Mr. Parker?

7           MR. PARKER:  Your Honor, I'll just note that that's

8   four weeks from -- four weeks from now that they would have to

9   go ahead and submit this brief, and then --

10          THE COURT:  No, no, no.  Wait.  I didn't make myself

11  clear.

12      I said if you just want the brief, I can have her file it

13  earlier.  But if you want to have the witnesses identified and

14  a summary of their testimony as part of it, then I think it's

15  reasonable to give her four weeks.  Because I don't know who

16  all these people are.  How many -- I mean, you have -- how many

17  employees do you have?  We didn't even discuss that.

18          MR. PARKER:  Your Honor, each location has

19  approximately 30 employees.

20          THE COURT:  So that's a lot of people for them to go

21  out and interview and decide whether they can bring them into

22  court.  They may have interviewed them already, but they've got

23  to go and hunt them down and find out whether these people will

24  give up their fears that they're saying they have and come and

25  testify.

1          MR. PARKER:  Your Honor, I would -- I would be fine

2    with getting a brief earlier and then having the identification

3    of the witnesses.  You know, I would suggest maybe a week

4    earlier than the 4th so that I have an opportunity to submit an

5    opposition.

6       But one additional ask I would make is that within

7    approximately a week I get a redacted version of the

8    investigative file that doesn't have any other names other than

9    Ms. Parra's in it, understanding that the ruling on the

10   so-called privilege hasn't been made yet.

11         THE COURT:  All right.  Other than the identification

12   of the witnesses and any summaries of their testimony, what's

13   the earliest you could get your motion on file with all the

14   other supporting documents?

15         MS. STA.ANA:  Including the investigative file, your

16   Honor?

17         THE COURT:  If that's what you want the Court to

18   consider.

19         MS. STA.ANA:  Well, that's -- I don't think that's

20   what I was suggesting.  But two weeks from today in terms of

21   brief writing and the motion.

22         THE COURT:  All right.  That's fair.  That's fair.

23   So let's say two weeks from today is the 20th.  The government

24   will get its motion.

25         THE CLERK:  The 21st, your Honor.  Today is the 7th.

1    Yeah, so the 21st, your Honor.

2                THE COURT:  Well, excuse me.

3                THE CLERK:  Well, I just wanted -- I'm sorry.  All

4    right.  The 21st.

5                THE COURT:  By July the 21st the plaintiff will file

6    its motion for preliminary injunction in full, together with

7    any attachments, declarations, points of authorities, exhibits,

8    or anything else that the government wants the Court to

9    consider in support of its motion with the exception of the

10   identification of witnesses who will testify live at the

11   hearing and the summary of their testimony.

12       Then two weeks after that, which would be August the 4th --

13   let me modify that.  Do you think you could do it by Monday,

14   August the 1st, to get those witness identification and

15   statements on file?

16               MS. STA.ANA:  We'll do our best if that's what the

17   Court requires.

18               THE COURT:  Okay.  I will, and I'll tell you why in a

19   minute.

20       So by August the 1st the government shall file its list of

21   the names of the witnesses who it will call to testify live at

22   the hearing, together with a brief summary of the nature of

23   their testimony.

24       Now, that doesn't have to be a verbatim statement of what

25   you expect them to say or anything else.  It can be very

1    summary.

2       Now, on August the 4th I'm going to suggest that the

3    defendant file its response to the motion for preliminary

4    injunction, together with any papers, including declarations,

5    points of authorities, exhibits, or anything else that it wants

6    the Court to consider in opposition to the motion, and that

7    shall also include a list of the witnesses that the defense

8    intends to call to testify live at the hearing and a brief

9    summary of the testimony of those witnesses.

10      Now, I know that's only going to give you three days from

11   the time you got the plaintiff's witnesses, but you have

12   everything else, all your other ducks in line.  I don't think

13   it's unreasonable that you give me your list of witnesses by

14   that day.

15          MR. PARKER:  Your Honor, that day I'll be traveling

16   from the Chianti region of Italy to Venice, Italy.  I return on

17   Sunday the 7th.  While I'm not -- I've already given up my 4th

18   of July weekend for this and for the government's briefing.  I

19   would like to at least have our brief -- even if it means the

20   hearing goes back a week -- I would like to at least have our

21   opposition due perhaps on the 11th or 10th.

22          THE COURT:  All right.  Well, if I do that, I might

23   as well not even require them -- no, I've already said

24   something so I don't have to repeat myself so I'll leave it the

25   way I have it.

1        Now, if you want to do it on the 11th or 12th, then I'm not

2    going to be able to have everything together to have the

3    hearing on the 16th.  So we're going to have to put the hearing

4    over a little longer.

5              MR. PARKER:  Your Honor, defense are available on the

6    23rd of August.

7              THE COURT:  Is that just as good for you,

8    Ms. Sta.Ana?

9              MS. STA.ANA:  That's fine with me.  If that's the

10   case, can we extend the time in which we reveal the names of

11   the witnesses?

12             THE COURT:  Yeah, okay.  Strike everything I said.

13             MS. STA.ANA:  Okay.

14             THE COURT:  That's what annoys me, because I try to

15   make it precise and now I haven't.  And I was going to ask you

16   to get a transcript of what I'm saying here to know what you

17   have to do, so strike everything that I've said about the

18   schedule.

19        Knowing that we can't have the hearing until August, what

20   was it, 23rd?  Let's take a break.  I'm too confused to give

21   you an accurate statement of what I want you to do.  Take a

22   ten-minute recess.

23             MR. PARKER:  Thank you, your Honor.

24             THE CLERK:  This court is in recess.

25        (Recess taken, 2:31 p.m. to 2:44 p.m.)

1          THE CLERK:  Remain seated.  This court is again in

2    session.

3          THE COURT:  You understand that during the break you

4    agreed on a schedule?

5          MS. STA.ANA:  Correct, your Honor.

6          THE COURT:  Would you like to state that for the

7    record?

8          MR. PARKER:  Counsel, would you like me to?

9          MS. STA.ANA:  Sure.

10         MR. PARKER:  Your Honor, if it pleases the Court, we

11   would have the plaintiff submit an opening brief by July 21st.

12   That brief would contain all evidence that they wanted the

13   Court to consider with the exception of evidence that they

14   would submit through live testimony.

15      The Department of Labor will also produce by that date the

16   full investigation file with the names redacted of individuals

17   other than Ms. Parra.

18      By August 8th, a mutual exchange of witnesses that either

19   party intends to present at the hearing would be submitted with

20   a brief summary of their testimony.

21      On August 11th, defendants would submit their opposition.

22   And if the Court would allow, the parties could appear for a

23   hearing on the 18th of August.

24         THE COURT:  All right.  That would be acceptable to

25   the Court.  As I stated when I tried to set forth the original

1    schedule, the filing from the plaintiff should include their

2    motion for preliminary injunction, any declarations that they

3    want the Court to consider in connection with the motion, the

4    points and authorities, any exhibits and anything else other

5    than the identification of the live witnesses should accompany

6    the motion that's filed on July the 21st.

7         Is that your understanding?

8              MS. STA.ANA:  That is my understanding.  I do have a

9    question, your Honor.  Since we're still not -- at that point

10   we're not hearing the privilege yet.  In terms of the

11   declarations from any of the workers.  Can those be filed under

12   seal on July -- during the July date?

13             THE COURT:  During the July date?

14             MS. STA.ANA:  Correct.

15             THE COURT:  Well, we're going to get their testimony

16   on August the 8th anyway, aren't we?

17             MS. STA.ANA:  August the 18th.

18             MR. PARKER:  Your Honor, if --

19             THE COURT:  What is August the 8th?

20             MR. PARKER:  Your Honor, there isn't an August the

21   8th.

22             THE COURT:  There is.  There is.  Well, hold it.

23   Hold it.

24             MR. PARKER:  Did I misspeak?  Oh.

25             THE COURT:  There is.  By August the 8th a mutual

1    exchange of witnesses that either party intends to present at

2    the hearing would be submitted with a brief summary of their

3    testimony.

4              MR. PARKER:  Your Honor, I apologize.  The parties

5    had agreed on August the 4th for that date, and that's what I

6    intended to state.  I apologize to the Court.

7              THE COURT:  All right.  So let me go back then.

8        Is what you want to file under seal on July the 21st the

9    same thing that you're going to be including in your filing on

10   August the 4th?

11             MS. STA.ANA:  Yes.  Eventually yes, your Honor.

12             THE COURT:  Well, then there's no problem.  Why would

13   you even file it under seal if Mr. Parker doesn't get to see it

14   until August the 4th?

15             MS. STA.ANA:  In terms of the witnesses that were

16   coming forth on the stand, your Honor, we just want to be able

17   to verify that they will be able to be there on August the

18   18th.  The declarations are in support of the motion for PI.

19             THE COURT:  I'm sorry, I don't understand.

20             MS. STA.ANA:  I'm just anticipating whether or not

21   everybody has filed a declaration.  I don't know if we can make

22   it on the August 18th date on the hearing for witnesses.  That

23   is why we have that time period in which we are talking to

24   workers.

25             THE COURT:  Oh, so you're going to have witnesses

1   submit declarations that you want the Court to consider even

2   though they're not called live?

3           MS. STA.ANA:  If there are declarations from workers

4   who cannot -- cannot make it to the August 18th date, your

5   Honor, is what I'm concerned with.

6           THE COURT:  Okay.  So just so you both understand it.

7   You're saying that the Court can consider declarations in

8   addition to live testimony.  I guess whether the witness

9   testifies live and is subject to cross-examination or submits a

10  declaration which is not subject to cross-examination will go

11  to the weight that you think the Court should give to it?

12          MS. STA.ANA:  That is my understanding, your Honor.

13          THE COURT:  Is that yours?

14          MR. PARKER:  Your Honor, it is my understanding that

15  someone could submit a declaration and then later still testify

16  live, and I would have no objection to that.  I would object to

17  declarations being submitted under seal.  I think the more

18  appropriate thing would be that they would have the names

19  redacted and identification information redacted from the

20  declaration.

21          THE COURT:  Before you get to that question.  Would

22  you agree that witnesses can submit declarations and then not

23  testify live?

24          MR. PARKER:  Correct, your Honor.  I believe that

25  they would be able to do that.

1          THE COURT:  Okay.  So why would you do it under seal

2  if you want the Court to consider it?

3          MS. STA.ANA:  Either way, your Honor.  We can do a

4  redacted version or under seal.

5          THE COURT:  Redacted.  All right.  That will be the

6  understanding.

7      All right.  So did you want to restate this again so that

8  we have it in one place on the record?  You're changing one

9  date and you're adding a provision for redacting declarations.

10         MR. PARKER:  I'm happy to give it my best.

11         THE COURT:  Okay.  Let's do that so that there's one

12  place you can both look and not disagree on what it is that you

13  have to do.

14         MR. PARKER:  Thank you, your Honor.

15     So on July 21st the parties have agreed to submit -- to

16  have plaintiffs submit an opening brief.  That would contain

17  all evidence that they want to go ahead and submit for the

18  Court to consider with the limited exception of live testimony

19  by witnesses at the hearing in the matter.

20     That will also include potential declarations by the

21  plaintiff submitted that will be redacted with identification

22  information of those declarants in support of the application

23  for the preliminary injunction.

24     That same day the Department of Labor will produce the full

25  investigation file to defendants with redacted names and

1    identification information of individuals other than Ms. Parra.

2        On August 4th the parties will mutually exchange a list of

3    any individuals that they intend to call for live testimony at

4    the hearing with a brief summary of their testimony.

5        On August 11th the defendants would file their opposition

6    with any and all information that the Court -- that they want

7    the Court to consider with the exception of live testimony.

8        And that at the hearing, it would be August 18th, the Court

9    to set the time, both counsel are available and would not

10   object to individuals testifying live that have already gone

11   ahead and submitted their declarations, nor will the parties

12   object to individuals that just submit declarations without

13   going ahead and testifying live.

14           THE COURT:  That sounds pretty complete.

15       Ms. Sta.Ana, do you agree with that?

16           MS. STA.ANA:  I do.

17           THE COURT:  All right.  That's the schedule then.

18           MR. PARKER:  Thank you, your Honor.

19           THE COURT:  See, you can agree.  Now all you have to

20   do is agree on the rest of the case and we won't even have to

21   come back.

22           MR. PARKER:  We hope we could accomplish that.

23           THE COURT:  I would add this.  You're both vigorous

24   advocates for your clients; however, this is not a criminal

25   case.  The defendants are not charged with a crime, and they

1   should not be treated as if they are criminals.  They are

2   business owners, they have a disagreement with the government,

3   it will eventually be resolved either by settlement or judgment

4   in this case.  But, in the meantime, they should be treated

5   like citizens by their government.  All right?

6          MS. STA.ANA:  Yes, your Honor.

7          MR. PARKER:  Thank you, your Honor.

8          THE CLERK:  Court is adjourned.  Thank you.

9          (Proceedings adjourned:  2:53 p.m.)

10              ---o0o---

11   I certify that the foregoing is a correct transcript from the

12   record of proceedings in the above-entitled matter.

13

14                    /s/ Thresha Spencer
                      THRESHA SPENCER
15                    CSR No. 11788, RPR

16

17

18

19

20

21

22

23

24

25